978 P.2d 191

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Stanford M. ITO, Defendant–Appellant.**

**No. 21259.**

Intermediate Court of Appeals of Hawai'i.

April 29, 1999.

As Amended May 14 and May 24, 1999.

---

Darren W.K. Ching and Darwin L.D. Ching (Yoshida & Ching), on the briefs, Honolulu, for defendant-appellant.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

In this appeal, we have been asked to decide whether the District Court of the First Circuit (the district court) properly relied on the results of a Horizontal Gaze Nystagmus (HGN) test in determining that probable cause existed to arrest Defendant–

Appellant Stanford M. Ito (Defendant) for driving under the influence of intoxicating liquor (DUI), in violation of Hawai'i Revised Statutes (HRS) § 291–4 (1993 & Supp.1998).[1] Defendant maintains that the HGN test results should not have been admitted into evidence because (1) no expert testimony was presented by Plaintiff–Appellee State of Hawai'i (the State) as to the scientific reliability of the test and the district court should not have taken judicial notice of the test's reliability, and (2) the police officer who administered the test admitted that he did not conduct one part of the test.

We disagree with Defendant's first contention. However, because the record reveals serious questions about whether the HGN test was properly administered to Defendant by an officer who was duly qualified to conduct the test and grade the test results, we vacate the August 20, 1997 Judgment convicting Defendant of DUI and remand for further proceedings.

### BACKGROUND

Based on the facts and documents stipulated to by Defendant and the State at Defendant's August 20, 1997 trial, the relevant circumstances underlying the instant case are as follows:

At about 1:20 a.m. on January 5, 1997, Honolulu Police Department (HPD) Officer Darius Evangelista (Officer Evangelista) stopped Defendant for speeding. Upon initially approaching Defendant, Officer Evangelista did not smell any alcohol on Defendant. On a second approach, however, Officer Evangelista detected a strong odor of alcohol on Defendant's person and noticed that Defendant's eyes were red. Officer Evangelista surmised that he did not smell alcohol on his first approach because the passenger in Defendant's car was smoking. Based on his observations,

Officer Evangelista ordered Defendant out of Defendant's car and had Defendant perform three field sobriety tests (FSTs): the walk-and-turn, the one-leg-stand, and the HGN.

During the one-leg-stand test, Defendant stood on one leg without raising his arms for twenty-nine seconds. In a written report documenting Defendant's performance on the FSTs, Officer Evangelista noted that Defendant "[d]id [this] test well."

Prior to administering the walk-and-turn test, Officer Evangelista explained and demonstrated the test to Defendant. Officer Evangelista instructed Defendant to take two sets of nine steps each in a straight line, making sure that the heel of the front foot touched the toes of the back foot. Officer Evangelista also directed Defendant to turn around after the first set by pivoting on the heel of one foot. Officer Evangelista observed that Defendant missed the heel-to-toe on steps seven and eight of the first set. Officer Evangelista also recorded that Defendant missed the heel-to-toe on steps four and nine of the second set. Additionally, Defendant stepped off the line and raised his arms on step four of the second set and, instead of pivoting on the heel of one foot between the first and second sets, picked up both feet and turned around.

While administering the HGN test to Defendant, Officer Evangelista observed that both of Defendant's eyes failed to follow Officer Evangelista's finger smoothly and demonstrated distinct nystagmus at the edge of Defendant's field of vision. Officer Evangelista candidly admitted, however, that in administering the HGN test, he usually did not check for the onset of nystagmus at an angle of forty-five degrees, one of the components of the test, and failed to do so in this instance. Nevertheless, based on Defendant's

---

1. Hawai'i Revised Statutes § 291–4 (1993 & Supp.1998) provides, in pertinent part:

   (a) A person commits the offense of driving under the influence of intoxicating liquor if:
   (1) The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor, meaning that the person concerned is under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty; or
   (2) The person operates or assumes actual physical control of the operation of any vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath.

overall performance on the FSTs, Officer Evangelista arrested Defendant for DUI.

At the police station, Defendant elected to take the Intoxilyzer[2] test, which measured his breath alcohol concentration level (BrAC) at 0.125.

Defendant and the State also stipulated that: (1) HPD had trained Officer Evangelista to administer the FSTs, including the HGN test; (2) the passenger in Defendant's car would testify that he was not smoking at the time of the stop; and (3) Defendant, if called to testify, would state that his eyes were bothered by the light emanating from the flashlight used by Officer Evangelista in conducting the HGN test.

At the commencement of trial on August 20, 1997, Defendant orally moved to dismiss the case and suppress any evidence against him on grounds that the State lacked probable cause to arrest him. After hearing arguments on Defendant's motion and considering the stipulated evidence, the district court identified the following three issues as being relevant to this case:

> The first issue is whether or not there was reasonable suspicion sufficient to allow [Officer Evangelista] to order [Defendant] out of the car. . . .
>
> The second issue is, assuming there was reasonable suspicion to order [Defendant] out of the car, was there sufficient addi-

tional evidence to give [Officer Evangelista] probable cause to arrest [Defendant] for DUI.

> The third issue is whether or not the evidence in total, if I deny your motions, is sufficient to establish beyond a reasonable doubt that [Defendant] either was operating under the influence on an—in an objective level or whether or not he had .085[sic] per cent [sic] or greater of alcohol in his blood[.]

As to the first issue, the district court concluded that the smell of alcohol and the officer's observation of Defendant's red eyes amounted to reasonable suspicion, notwithstanding the proffered testimony of Defendant's passenger. The district court noted that "if [Officer Evangelista] frankly were fabricating, he would have just said he smelled it the first time anyways [sic]. I think [Officer Evangelista] was being honest."

Regarding the probable cause issue, the district court engaged in the following colloquy:

> I've viewed the tape [of Defendant's performance on the FSTs]. From my vantage point viewing the tape, which wasn't perfect and it wasn't a perfect tape certainly, . . . I would say that if I had to consider only the evidence on the tape, it didn't

---

2. The Intoxilyzer is a machine that measures the concentration of alcohol in a breath sample (BrAC). 2 R. Erwin, *Defense of Drunk Driving Cases* § 21.01, at 21–2 to 21–3 (3d ed. 1999) (*Defense of Drunk Driving*); *see also State v. Gates*, 7 Haw.App. 440, 777 P.2d 717 (1989). The Intoxilyzer then reports either an assumed blood alcohol concentration (BAC) (which is achieved by multiplying the individual's BrAC by a conversion factor, a partition ratio of 2100 to 1), *Gates*, 7 Haw.App. at 443, 777 P.2d at 719, or a BrAC which is "usually in terms of grams [of] alcohol per 210 liters of breath, such as 0.10g/210L." 2 *Defense of Drunk Driving* § 21.01, at 21–2 to 21–3. "The assumption is that a BrAC of 0.10g/210L is equivalent to a BAC of 0.10 [percent]." *Id.* at 21–3. Strictly speaking, expressing BAC as a percentage is not truly accurate because what is being expressed as a percentage is really a comparison of weight to volume. *City of Monroe v. Robinson*, 316 So.2d 119, 121 n.1 (La.1975); 2 *Defense of Drunk Driving* § 15.02[3], at 15-9. The practice of expressing BAC as a percentage of weight per volume (% w/v) stems

from "[a] laboratory practice widely followed in this country and elsewhere for expressing solution strengths when small quantities of a liquid or a solid are dissolved in a relatively large amount of a liquid[.]" *City of Monroe*, 316 So.2d at 121 n.1; *Commonwealth v. Brooks*, 366 Mass. 423, 319 N.E.2d 901, 906 (1974).

> The reason for this is that measurement by weighing is the only accurate way to quantify extremely small amounts of substance. Expensive analytical balances in laboratories. . . are capable of precisely determining weight even down to the fraction of a milligram. For the liquid, however, the most convenient method of measurement is volumetric.
> The most straightforward method of expressing solution strength is to put it simply in terms of number of milligrams of the substance per milliliter of solution—or, if more convenient, per 100 milliliters of solution.

*City of Monroe*, 316 So.2d at 121 n.1 (internal quotation marks omitted).

appear to me that there was enough to establish probable cause..

However, the transcript and the exhibits submitted show a couple of things. One, they do show that [Officer Evangelista] observed [Defendant's] eyes and smell of alcohol, things I can't discern from the tape, obviously.

It also indicated that, although he did pretty well on the two physical tests given as part of the [FSTs], he also administered a field—one field sobriety test called the [HGN] test, at least two of the three standard tests given as far as the HGN.

And on those, both of those, he noted indicia of impairment, lack of smooth pursuit and the appearance of nystagmus, which is the involuntary jerking of the eyeball.

I will say for the record that if I didn't have the HGN in front of me, I would rule that there was not probable cause based on the evidence that [Officer Evangelista] had in front of him. I don't think a reasonable officer could have entertained a strong suspicion. That's the test under [Hawai'i Rules of Penal Procedure] Rule 5. But I will take, as I have taken, judicial notice of the [HGN test].

Now at this point, [Defense counsel], you're objecting to my taking judicial notice of the HGN, I'm assuming, because it has not been recognize [sic] by the Hawaii [Hawai'i] Appellate Courts, is that correct? And the State has indicate—has introduced no scientific testimony to establish the foundation for it. . . .

[DEFENSE COUNSEL]: Yes, Your Honor.

\* \* \*

The only other thing is, Your Honor, factually there's indication he did not even follow [the HGN] test because he's indicated he didn't even do the third part on that.

[THE COURT]: He didn't do the third part, I agree. He didn't find the angle of onset. And I think probably—well, I haven't ruled on it yet so technically I'll note that he did not do that. . . .

Now what I've done and I'll do today is I'll indicate that I, I follow the rationale of

the Oregon Supreme Court in *State vs. O'Key*, . . . at 899 [P.2d] 663, a 1995 case in which Justice Unis . . . ruled after a pretty lengthy discussion that courts could take judicial notice of the [HGN test], that HGN wasn't something that was so scientifically difficult to comprehend that we needed scientific testimony.

I'll also note that most other states have indeed recognized [the HGN test] through their appellate decisions. I think our court will indeed do so as well, but the HGN is the same in Hawaii [Hawai'i] as it is in Oregon; and I'm satisfied that Justice Unis' logic and scholarship are sound. So I have taken judicial notice of this for a couple of years at this point.

Soon thereafter, the district court inquired:

Is there a stipulation that Officer Evangelista was trained through the standard course at, at HPD? I assume he would testify to that[,] otherwise he wouldn't be given [sic] the test. But I think, I think they have to establish that as part of the foundation. I don't think it's difficult to establish, but is that a problem?

The following colloquy ensued:

[DEFENSE COUNSEL]: I don't have a problem with that, but part of the objection to judicial notice would be also the foundation. I wanna [sic] just preserve the issue of the Delbert [sic], the Monta—

[THE COURT]: Right. Well that you can preserve; but I think—you don't doubt that Officer Evangelista would say that he was given training on the HGN?

[DEFENSE COUNSEL]: If called to testify, yes, I will.

[THE COURT]: And I'm assuming that the standard training from HPD is, I've always assumed it to be sufficient so I'll assume he has in fact been qualified to give the test. He—the question is, was the test administered properly?

Well, he only gave two of the three. I don't find that to be an improper administration of the test, even if it's an incomplete administration because even if [Defendant] had come through the third part with flying colors, technically there'd still be enough question based on the way the

first two came out that it would, it would leave [Officer Evangelista] in a position of substantial doubt as to [Defendant's] ability to drive under the circumstances.

[DEFENSE COUNSEL]: You're talking about the first two portions of the HGN?

[THE COURT]: That's enough. And I have seen tests where someone can actually—pass or fail is not the right word, but he shows nystagmus, shows lack of smooth pursuit, but the angle of onset might not be quite what they'd ask for. Even two in the three would be enough I think to establish strong suspicion. It would not be enough if we were admitting it on the case-in-chief; but that is not relevant here since we have other evidence on the case-in-chief.

So I'm gonna [sic] accept it. I'll take judicial notice that nystagmus itself and the lack of smooth pursuit is enough. It [sic] show—it's consistent with alcohol impairment even though it may be consistent with other kinds of impairment—from head injuries, from certain kinds of drugs—I accept that.

But for purposes of probable cause, I think that and the other fairly minor indicia are enough to lead a reasonable officer to entertain a strong suspicion in this case. It would not be enough to convict and I'll indicate that if the case went to trial on [HRS § 291–4(a)(1)] alone, I would not convict him.

And if I had all the evidence I had except for the [HGN] test, I would find no probable cause. So this is really a test of whether the HGN is, is good; but I think it is and I have to accept it on that basis....

\* \* \*

[THE COURT]: All right. So given the HGN, I'm gonna [sic] find that there's probable cause. I think that's enough. It's a close case, but I think that that's—the HGN does give me enough on that.

As to the sufficiency of the evidence issue, the district court concluded that although Defendant's HGN test result was not sufficient to support a DUI conviction, evidence that Defendant had a 0.125 BrAC was sufficient to convict Defendant of DUI.

The district court thereafter convicted and sentenced Defendant for DUI. Pursuant to a plea agreement, the State dismissed the speeding charge.

This appeal followed.

## DISCUSSION

### I. *The HGN Test*

Nystagmus is a well-known physiological phenomenon that has been defined by one medical dictionary as "an involuntary rapid movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed, i.e., of two varieties." *Dorland's Illustrated Medical Dictionary* 910 (26th ed.1981). *See also Sloane–Dorland Annotated Medical–Legal Dictionary* 381 (Supp.1992). HGN or jerk nystagmus is a particular type of nystagmus "characterized by a slow drift, usually away from the direction of gaze, followed by a quick jerk or recovery in the direction of gaze." *The Merck Manual of Diagnosis and Therapy* 1980 (14th ed.1982). Stated otherwise, it "is the inability of the eyes to maintain visual fixation as they are turned from side to side." 8 Am.Jur.2d *Automobiles and Highway Traffic* § 1082, at 632 (1997).

It is undisputed that there are many factors that can cause nystagmus: problems in an individual's inner ear labyrinth; physiological problems such as influenza, streptococcus infection, vertigo, epilepsy, or measles; conditions such as eye muscle fatigue, sunstroke, or glaucoma; changes in atmospheric pressure; and consumption of substances such as caffeine, nicotine, or aspirin. *See* 1 R. Erwin, *Defense of Drunk Driving Cases* § 10.09[5], at 10–43 (3d ed. 1999) (*Defense of Drunk Driving*); M. Rouleau, *Unreliability of the Horizontal Gaze Nystagmus Test*, 4 Am.Jur. Proof of Facts 3d 439 § 9, at 455 (1989) (4 Am.Jur. POF 3d); National Highway Traffic Safety Administration (NHTSA), United States Department of Transportation (DOT), No. DOT HS–0806512, *Improved Sobriety Testing* (1984) (*1984 NHTSA Instruction Manual*), reprinted in 1 *Defense of Drunk Driving* § 10.99[2], app. at 10–93.

However, it has been well-documented through research studies over the years that alcohol intoxication affects eye movement and nystagmus becomes more pronounced with alcohol consumption. Comment, *Can Your Eyes Be Used Against You? The Use of the Horizontal Gaze Nystagmus Test in the Courtroom*, 84 J.Crim. L. & Criminology 203, 207 (1993) (Comment, 84 J.Crim. L. & Criminology); A. Moenssens, J. Starrs, C. Henderson, & F. Inbau, *Scientific Evidence in Civil and Criminal Cases* § 3.10, at 205–06, & n. 1 (4th ed. 1995) (*Scientific Evidence in Civil and Criminal Cases*); E. Fiandach, *Handling Drunk Driving Cases* § 7.10, at 7–25 to 7–28 (2d ed.1995). During the 1970's, these studies prompted the NHTSA, acting under the auspices of the DOT, to conduct research into the effectiveness of various psychophysical tests that could be administered by police officers in the field to evaluate persons suspected of DUI. *See* 1 *Defense of Drunk Driving* § 10.02, at 10–13; 4 Am.Jur. POF 3d § 1, at 445. Based on this research, the NHTSA, in 1977, formulated and endorsed for police use a battery of three FSTs—the walk-and-turn, the one-leg-stand, and the HGN—that were determined after research to be the most effective for detecting alcohol impairment. Comment, 84 J.Crim. L. & Criminology at 207; *1984 NHTSA Instruction Manual, reprinted in* 1 *Defense of Drunk Driving* § 10.99[2], app. at 10–91. In 1984, the NHTSA published an instruction manual on the proper techniques for administering the FSTs. Comment, 84 J.Crim. L. & Criminology at 207; *1984 NHTSA Instruction Manual, reprinted in* 1 *Defense of Drunk Driving* § 10.99[2], app. at 10–90 to 10–98.

The HGN test

is based on the observation of three different physical manifestations which occur when a person is under the influence of alcohol: (1) the inability of a person to follow, visually, in a smooth way, an object that is moved laterally in front of the person's eyes; (2) the inability to retain focus and the likelihood of jerking of the eyeball when a person has moved his or her eye to the extreme range of peripheral vision; and (3) the reported observation that this "jerking" of the eyeball begins before the eye has moved 45 degrees from forward gaze if the individual's BAC [ (Blood Alcohol Content) ] is .10 [percent] or higher.

*Scientific Evidence in Civil and Criminal Cases* § 3.10, at 206 (footnote omitted).

The only equipment needed to administer the HGN test is a stimulus, such as a pen, penlight, or the officer's finger. The stimulus is positioned about twelve to fifteen inches in front of a suspect's eyes. *1984 NHTSA Instruction Manual, reprinted in* 1 *Defense of Drunk Driving* § 10.99[2], app. at 10–93. As the officer gradually moves the stimulus towards the suspect's ear and out of the suspect's field of vision, the officer observes the suspect's eyeballs to detect three signs of intoxication: an angle of onset of nystagmus (measured from the suspect's nose) of forty-five degrees or less; distinct or pronounced nystagmus at the eye's maximum horizontal deviation; and the inability of the eyes to smoothly pursue the stimulus.[3] Note, *Horizontal Gaze Nystagmus: A Closer*

---

3. In 1984, the National Highway Traffic Safety Administration (NHTSA) published *Improved Sobriety Testing*, a manual which contains instructions on administering the Horizontal Gaze Nystagmus (HGN) test. NHTSA, United States Department of Transportation (DOT), No. DOT HS–0806512, *Improved Sobriety Testing* (1984) (*1984 NHTSA Instruction Manual*), reprinted in 1 *Defense of Drunk Driving* § 10.99[2], app. at 10–90 to 10–98. The NHTSA updated these instructions by issuing *DWI [ (Driving While Intoxicated) ] Detection and Standardized Field Sobriety Testing, Student Manual* in 1995. NHTSA, Transportation Safety Institute, DOT, No. HS 178 R 10/95, *DWI Detection and Standardized Field Sobriety Testing, Student Manual* (1995) (*1995 NHTSA Student Manual*), reprinted in part in 1 *Defense of Drunk Driving* § 10.06[5], at 10–27 to 10–30. The *1995 NHTSA Student Manual* explains how the HGN test works, provides instructions as to how an officer is to estimate the angle at which nystagmus begins, and sets forth the following specific procedures which an officer should follow in administering the HGN test:

Begin by asking "are you wearing contact lenses", make a note whether or not the suspect wears contacts before starting the test.
If the suspect is wearing glasses, have them removed.
Give the suspect the following instructions from a position of interrogation (FOR OFFICER KEEP YOUR WEAPON AWAY FROM THE SUSPECT):
● "I am going to check your eyes."

*Look,* 36 Jurimetrics Journal 383, 384 (1996) (Note, 36 Jurimetrics Journal). The officer scores one point for each sign of intoxication per eye, the maximum score being six points. A person who takes the HGN test and receives a score of four or more points is classified as having a BAC of over 0.10 percent. *Id.*

- "Keep your head still and follow this stimulus with your eyes only."
- "Keep focusing on this stimulus until I tell you to stop."

Position the stimulus approximately 12–15 inches from the suspect's nose and slightly above eye level. Check the suspect's eyes for the ability to track together. Move the stimulus smoothly across the suspect's entire field of vision. Check to see if the eyes track the stimulus together or [if one] lags behind the other. If the eyes don't track together it could indicate a possible medical disorder, injury, or blindness.

Next, check to see that both pupils are equal in size. If they are not, this may indicate a head injury.

Check the suspect's left eye by moving the stimulus to your right. Move the stimulus smoothly, at a speed that requires about two seconds to bring the suspect's eye as far to the side as it can go. While moving the stimulus, look at the suspect's eye and determine whether it is *able to pursue smoothly.* Now, move the stimulus all the way to the left, back across suspect's face checking if the right eye pursues smoothly. Movement of the stimulus should take approximately two seconds out and two seconds back for each eye. Repeat the procedure.

After you have checked both eyes for smooth pursuit, check the eyes for *distinct nystagmus at maximum deviation* beginning with the suspect's left eye. Simply move the object to the suspect's left side until the eye has gone as far to the side as possible. Usually, no white will be showing in the corner of the eye at maximum deviation. Hold the eye at that position for approximately four seconds, and observe the eye for distinct nystagmus. Move the stimulus all the way across the suspect's face to check the right eye holding that position for approximately four seconds. Repeat the procedure.

After checking the eyes at maximum deviation, check for onset of nystagmus prior to 45 degrees. Start moving the stimulus towards the right (suspect's left eye) at a speed that would take about four seconds for the stimulus to reach the edge of the suspect's shoulder. Watch the eye carefully for any sign of jerking. When you see it, stop and verify that the jerking continues. Now, move the stimulus to the left (suspect's right eye) at a speed that would take about four seconds for the stimulus to reach the edge of the suspect's shoulder.

## II. *The Admissibility of HGN Test Results: A Survey of the Case Law*

The vast majority of courts across the country that have considered the issue have had no difficulty concluding that as long as the proper foundational prerequisites are met, HGN test results may be admitted as

Watch the eye carefully for any sign of jerking. When you see it, stop and verify that the jerking continues. Repeat the procedure. NOTE: It is important to use the full four seconds when checking for onset of nystagmus. If you move the stimulus too fast, you may go past the point of onset or miss it altogether.

If the suspect's eyes start jerking before they reach 45 degrees, check to see that some white of the eye is still showing on the side closest to the ear. If no white of the eye is showing, you either have taken the eye too far to the side (that is more than 45 degrees) or the person has unusual eyes that will not deviate very far to the side.

NOTE: Nystagmus may be due to causes other than alcohol. These other causes include seizure medications, [phencyclidine], inhalants, barbiturates and other depressants. A large disparity between the performance of the right and left eye may indicate a medical condition. *Id.* at 10–28 to 10–29 (emphases in original).

The *1995 NHTSA Student Manual* also establishes the following procedure for interpreting the HGN test:

You should look for three clues of intoxication in each eye.

1. The eye cannot follow a moving object smoothly.

2. Nystagmus is distinct when the eye is at maximum deviation.

3. The angle of onset of nystagmus is prior to 45 degrees.

If you observe four or more clues, it is likely that the suspect's BAC is above 0.10. Using this criterion you will be able to classify correctly about 77 percent of your suspects with respect to whether they are above 0.10. That probability was determined during laboratory and field testing and helps you weigh the various field sobriety tests in this battery as you make your arrest decision.

* * *

[HGN] can be observed directly and does not require special equipment. You will need something for the suspect to follow with the eyes, but this can be as simple as the tip of your index finger, penlight, or pen. The stimulus used should be held slightly above eye level, so that the eyes are wide open when they look directly at it. It should be held about 12–15 inches in front of the nose for ease of focus. Remain aware of your position in relation to the suspect at all times. . . .

*Id.* at 10–29 to 10–30.

evidence of probable cause to arrest a person for DUI, although not to prove intoxication or that a defendant's BAC exceeded a particular percentage. *See, e.g., State v. Grier,* 791 P.2d 627 (Alaska Ct.App.1990), *overruled on other grounds by State v. Coon,* 974 P.2d 386 (Alaska 1999) (adopting the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (the *Daubert* standard) over the one in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923) (the *Frye* standard)); *State v. Superior Court,* 149 Ariz. 269, 718 P.2d 171 (1986); *Whitson v. State,* 314 Ark. 458, 863 S.W.2d 794 (1993); *State v. Garrett,* 119 Idaho 878, 811 P.2d 488 (1991); *People v. Buening,* 229 Ill.App.3d 538, 170 Ill.Dec. 542, 592 N.E.2d 1222 (1992), *appeal denied,* 146 Ill.2d 634, 176 Ill.Dec. 806, 602 N.E.2d 460 (1992); *State v. Armstrong,* 561 So.2d 883 (La.Ct.App.1990), *writ denied,* 568 So.2d 1077 (La.1990); *State v. Taylor,* 694 A.2d 907 (Me.1997); *Young v. City of Brookhaven,* 693 So.2d 1355 (Miss.1997); *State v. Hill,* 865 S.W.2d 702 (Mo.Ct.App.1993), *overruled on other grounds by State v. Carson,* 941 S.W.2d 518 (Mo.1997); *City of Fargo v. McLaughlin,* 512 N.W.2d 700 (N.D.1994); *State v. Bresson,* 51 Ohio St.3d 123, 554 N.E.2d 1330 (Ohio 1990); *State v. Sullivan,* 310 S.C. 311, 426 S.E.2d 766 (1993); *Emerson v. State,* 880 S.W.2d 759 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 931, 115 S.Ct. 323, 130 L.Ed.2d 284 (1994).

Courts have been deeply divided, however, as to what constitutes the proper foundation for the admissibility of HGN test results. Much of the debate has focused on the two

issues raised by Defendant in this appeal: (1) whether HGN testing is "scientific" in nature and, if so, what foundational requirements must be met before allowing HGN test results into evidence; and (2) whether the HGN test was properly administered by an officer qualified to administer the test.

A minority of jurisdictions have held that HGN testing is based on a police officer's personal observations of a driver's physical characteristics and is not scientific in nature. These jurisdictions view HGN tests as no different from other FSTs, such as the walk-and-turn or the one-leg-stand, and admit HGN test results into evidence without scientific foundation or expert interpretation. *See, e.g., City of Fargo v. McLaughlin,* 512 N.W.2d 700 (N.D.1994); *State v. Bresson,* 51 Ohio St.3d 123, 554 N.E.2d 1330 (1990); *State v. Sullivan,* 310 S.C. 311, 426 S.E.2d 766 (1993); *Finley v. State,* 809 S.W.2d 909 (Tex.App.1991); *Salt Lake City v. Garcia,* 912 P.2d 997 (Utah App.1996), *cert. denied,* 919 P.2d 1208 (Utah 1996).

A second group of courts have concluded that unlike the walk-and-turn and the one-leg-stand FSTs, which are grounded in common knowledge that excessive alcohol can cause coordination, balance, and mental agility problems, HGN testing is based on a scientific principle not generally known by lay jurors. Due to this scientific nature, HGN test results are not admitted by these courts unless expert testimony meeting the criteria set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)[4]; *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)[5];

---

4. In *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923), the District of Columbia Court of Appeals held that before evidence derived from a novel or innovative scientific test, such as a systolic blood pressure deception test, could be admitted, expert testimony must be adduced as to the general acceptance of such test in the particular scientific field. *Id.* at 1014. The *Frye* "general acceptance" test was the dominant federal and state standard for determining the admissibility of novel scientific evidence at trial for seventy years, until it was overruled in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 585, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

5. In *Daubert,* the United States Supreme Court held that the "general acceptance" test set out in *Frye* was superseded when the Federal Rules of

Evidence (FRE) were adopted. 509 U.S. at 587, 113 S.Ct. 2786. The Court pointed out that pursuant to FRE Rule 402, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." *Id.* at 587, 113 S.Ct. 2786. Moreover, FRE Rule 702, which governs expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

or a pertinent state rule of evidence is adduced to demonstrate the reliability and acceptability of the test. *See e.g., Ex parte Malone v. City of Silverhill,* 575 So.2d 106 (Ala.1990); *People v. Leahy,* 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321 (1994); *State v. Merritt,* 36 Conn.App. 76, 647 A.2d 1021 (1994); *State v. Meador,* 674 So.2d 826 (Fla. Dist.Ct.App.1996), *review denied,* 686 So.2d 580 (Fla.1996); *State v. Witte,* 251 Kan. 313, 836 P.2d 1110 (1992); *Commonwealth v. Sands,* 424 Mass. 184, 675 N.E.2d 370 (1997); *State v. Wheeler,* 764 S.W.2d 523 (Mo.Ct.App. 1989); *State v. Borchardt,* 224 Neb. 47, 395 N.W.2d 551 (1986); *State v. Torres,* 127 N.M. 20, 976 P.2d 20 (1999); *People v. Heidelmark,* 214 A.D.2d 767, 624 N.Y.S.2d 656 (N.Y.App.Div.1995), *appeal denied,* 85 N.Y.2d 973, 629 N.Y.S.2d 733, 653 N.E.2d 629 (1995); *State v. Helms,* 345 N.C. 578, 504 S.E.2d 293 (1998); *Yell v. State,* 856 P.2d 996 (Okla.Crim.App.1993); *State v. O'Key,* 321 Or. 285, 899 P.2d 663 (1995); *Commonwealth v. Moore,* 430 Pa.Super. 575, 635 A.2d 625 (1993), *appeal denied,* 540 Pa. 612, 656 A.2d 118 (1995); *State v. Murphy,* 953 S.W.2d 200 (Tenn.1997); *State v. Cissne,* 72 Wash.App. 677, 865 P.2d 564 (1994), *review denied,* 124 Wash.2d 1006, 877 P.2d 1288 (1994); *State v. Barker,* 179 W.Va. 194, 366 S.E.2d 642 (1988), *overruled on other grounds by Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993) (adopting the *Daubert* standard over the *Frye* standard). "In effect, these cases require HGN test results to be scientifically validated in each individual case, or at least recognized as scientifically valid once by an appellate court within the jurisdiction." *City of Fargo v. McLaughlin,* 512 N.W.2d at 706.

A third group of courts, while agreeing that HGN testing is scientific in nature, have determined, based on a review of relevant case law and scientific publications, that the HGN test is a reliable and accepted indicator of intoxication and, therefore, HGN test results are admissible without further expert testimony as to the scientific validity and reliability of HGN testing, as long as proper foundation as to the techniques used and the police officer's training, experience, and ability to administer the test has been laid. *See, e.g., Ballard v. State,* 955 P.2d 931 (Alaska Ct.App.1998), *overruled on other grounds by State v. Coon,* 974 P.2d 386 (Alaska 1999) (adopting the *Daubert* standard over the *Frye* standard); *State ex rel. Hamilton v. City Court,* 165 Ariz. 514, 799 P.2d 855 (1990); *Zimmerman v. State,* 693 A.2d 311 (Del.1997); *Hawkins v. State,* 223 Ga.App. 34, 476 S.E.2d 803 (1996); *People v. Buening,* 229 Ill.App.3d 538, 170 Ill.Dec. 542, 592 N.E.2d 1222 (1992), *appeal denied,* 146 Ill.2d 634, 176 Ill.Dec. 806, 602 N.E.2d 460 (1992); *State v. Murphy,* 451 N.W.2d 154 (Iowa 1990); *State v. Armstrong,* 561 So.2d 883 (La.Ct.App.1990), *writ denied,* 568 So.2d 1077 (La.1990); *State v. Taylor,* 694 A.2d 907 (Me.1997); *Schultz v. State,* 106 Md.App. 145, 664 A.2d 60 (1995); *People v. Berger,* 217 Mich.App. 213, 551 N.W.2d 421 (1996); *State v. Clark,* 234 Mont. 222, 762 P.2d 853 (1988); *Emerson v. State,* 880 S.W.2d 759 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 931, 115 S.Ct. 323, 130 L.Ed.2d 284 (1994). These courts have either taken judicial notice of the validity and reliability of the HGN test or concluded that HGN test results are admissible as scientific evidence as a matter of law.

### III. *Hawai'i Law*

In Hawai'i, the admissibility of scientific or technical evidence is governed by Hawai'i Rules of Evidence (HRE) Rules 702 (1993) and 703 (1993), which provide as follows:

**Rule 702 Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

Under the FRE, the Court stated, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786. In determining the reliability of proferred scientific testimony, the Court added, some of the factors that may be considered by the trial judge are: (1) whether the underlying scientific technique can be tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has gained widespread acceptance within the relevant scientific community. *Id.* at 593–95, 113 S.Ct. 2786.

training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.[6]

**Rule 703   Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

(Footnote added.)

■   The Hawai'i Supreme Court has held that under HRE Rules 702 (1985) and 703 (1993), the following factors should be considered in determining the admissibility of scientific evidence at trial:

1) the evidence will assist the trier of fact to understand the evidence or to determine a fact in issue;

2) the evidence will add to the common understanding of the jury;

3) the underlying theory is generally accepted as valid;

4) the procedures used are generally accepted as reliable if performed properly;

5) the procedures were applied and conducted properly in the present instance[; and] . . .

[6] ]   whether admitting such evidence will be more probative than prejudicial.

*State v. Montalbo,* 73 Haw. 130, 140, 828 P.2d 1274, 1280–81 (1992).

In *State v. Toyomura,* 80 Hawai'i 8, 904 P.2d 893 (1995), a DUI case, the Hawai'i Supreme Court held that insufficient foundation had been laid under HRE Rule 702 to permit a police officer, who had been neither properly offered as an expert witness nor regarded as such by the trial court, to render an opinion, based on the defendant's performance on FSTs, that the defendant was intoxicated.  The supreme court stated that to lay a proper foundation for the officer's testimony, the prosecution was required to establish that

(1) the [HGN], "one-leg[-]stand," and "walk-and-turn" procedures were elements of the HPD's official FST protocol, (2) there was [an] authoritatively established relationship between the manner of performance of these procedures and a person's degree of intoxication, and (3) [the officer] had received any specific training in the administration of the procedures and the "grading" of their results.

6.  Following the Hawai'i Supreme Court's decision in *State v. Montalbo*, 73 Haw. 130, 828 P.2d 1274 (1992), the state legislature amended Hawai'i Rules of Evidence (HRE) Rule 702 (1993) to add the second sentence.  According to the Supplemental Commentary to Rule 702:

The problem with Fed.R.Evid. 702, as adopted in 1975, and with original Haw. R. Evid. 702, patterned thereafter, was that neither of these rules nor their commentaries mentioned *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir. 1923), establishing a requirement that a novel scientific development or technique "have gained general acceptance in the particular field in which it belongs" as a condition of admissibility in connection with expert testimony.  The general-acceptance standard of Frye was widely recognized as a reliability check of emerging scientific developments and techniques.

The criterion of Rule 702, that expert testimony "assist the trier of fact to understand the. evidence," necessarily incorporates a reliabili-

ty factor and thus countenances a Frye-like inquiry as an ingredient of the reliability determination.  This is the holding of *State v. Montalbo*, 73 H[aw]. 130, 828 P.2d 1274 (1992), observing that Rule 702's assistance requirement contemplates expert testimony based upon "a sound factual foundation . . . an explicable and reliable system of analysis . . . [and having the capacity to] add to the common understanding of the jury."  The reliability determination "could include the Frye test," *id.*, but is not so limited: "[I]t is possible that a court could also consider the scientific procedure itself, as well as other evidence of the procedure's reliability."  *Id.* Montalbo thus anticipated the present Rule 702 amendment, thereby confirming the drafters' belief that the amendment makes explicit what was formerly implicit in the assistance criterion.  General acceptance in the scientific community is highly probative of the reliability of a new technique but should not be used as an exclusive threshold for admissibility determinations.

*Id.* at 26, 904 P.2d at 911. By requiring that a proper HRE Rule 702 foundation be laid for admission of evidence of a defendant's performance on FSTs, the supreme court implicitly acknowledged that such evidence constituted "scientific, technical, or other specialized knowledge[.]" *See* HRE Rule 702. It is not clear from *Toyomura, supra,* however, whether the supreme court would have found proper foundation for admission of the results of the FSTs if the prosecution had established that the officer administering the FSTs had "received any specific training in the administration of the procedures and the 'grading' of their results" so as to qualify as an expert pursuant to HRE Rule 702, or whether the supreme court would have insisted upon the further testimony of a properly qualified scientist to testify to the scientific validity and reliability of the FSTs in detecting intoxication.

In *State v. Fukusaku,* 85 Hawai'i 462, 946 P.2d 32 (1997), the supreme court, observing that "[t]he principles and procedures under-

lying hair and fiber evidence are overwhelmingly accepted as reliable[,]" essentially took judicial notice of the reliability of the underlying scientific principles and the methodology employed in hair and fiber analysis, thereby obviating the need for independent expert testimony regarding said principles and methodology.[7] *Id.* at 473, 946 P.2d at 43.

In this case, we examine whether, under the relevant Hawai'i evidentiary rules and case law, (1) the scientific principles and procedures underlying HGN testing are so well-established that their reliability may be presumed, (2) the district court properly took judicial notice of their reliability, and (3) the HGN test was properly administered by an officer who had been properly trained to administer the test.

### A. Whether the Scientific Principles and Procedures Underlying HGN Testing Are So Well–Established That Their Reliability May Be Presumed

In *Montalbo,* the Hawai'i Supreme Court held that the reliability of scientific evidence

---

7. In *State v. Fukusaku,* 85 Hawai'i 462, 946 P.2d 32 (1997), the supreme court held that the evidentiary standards for admission of testimony regarding "scientific," as opposed to "technical," knowledge are different. *Id.* at 473, 946 P.2d at 43. Rejecting the defendant's claim that the *Daubert* standards applied to the "technical" hair and fiber evidence proffered by the prosecution's witness, the supreme court explained:

> "Scientific knowledge" must be distinguished from "technical knowledge." Expert testimony deals with "scientific knowledge" when it involves the validity of the scientific principles and the reliability of the scientific procedures themselves. In contrast, expert testimony deals with "technical knowledge" when it involves the mere technical application of well-established scientific principles and procedures. In such a situation, because the underlying scientific principles and procedures are of proven validity/reliability, it is unnecessary to subject technical knowledge to the same type of full-scale reliability determination required for scientific knowledge. Thus, although technical knowledge, like all expert testimony, must be both relevant and reliable, its reliability may be presumed.

> *Id.*

It is not clear from a reading of *Fukusaku, supra,* whether the supreme court was adopting the *Daubert* standards for analyzing the admissibility of scientific evidence. We note, however, that in *Kumho Tire Co. v. Carmichael,* — U.S. ——, 119 S.Ct. 1167, — L.Ed.2d — (1999),

the United States Supreme Court held that the standards for analyzing scientific evidence articulated in *Daubert,* 509 U.S. at 589, 593–95, 113 S.Ct. 2786, apply equally to technical evidence. *Kumho Tire Co.,* — U.S. at ——, 119 S.Ct. at 1174. The Supreme Court concluded that the trial court did not abuse its discretion by applying the *Daubert* factors to determine that the technical evidence proffered by an engineering expert was not reliable. *Id.* at ——, ——, 119 S.Ct. at 1175, 1179. Because the Hawai'i evidentiary rules which govern the admission of scientific and technical evidence are patterned after Federal Rules of Evidence Rules 702 and 703, *see* discussion, *supra* section III & note 6, it is possible, in light of *Kumho Tire Co., supra,* that the Hawai'i Supreme Court will revisit its ruling in *Fukusaku* that calls for disparate treatment to be accorded to "scientific" versus "technical" evidence under HRE Rules 702 and 703.

The holding in *Kumho Tire Co., supra,* however, does not alter the outcome in *Fukusaku, supra.* In *Fukusaku,* although the Hawai'i Supreme Court acknowledged the distinction between "scientific" and "technical" evidence, it also obviated the need for testimony regarding the principles and methodology underlying hair and fiber analysis by concluding that said principles were reliable. 85 Hawai'i at 473, 946 P.2d at 43. Such a conclusion amounted to taking judicial notice that the underlying scientific principles and methodology employed in procuring the "technical" hair and fiber evidence were indeed reliable.

depends on three factors: "the validity of the underlying principle, the validity of the technique applying that principle, and the proper application of the technique on the particular occasion." 73 Haw. at 136, 828 P.2d at 1279. The supreme court further explained that "[a]lthough general acceptance in the scientific field is highly probative of the reliability of a scientific procedure, there are other indicators of suitability for admission at trial." 73 Haw. at 138, 828 P.2d at 1280. In a footnote, the supreme court listed the following factors that the Second Circuit Court of Appeals considered in *United States v. Williams*, 583 F.2d 1194 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); and *United States v. Jakobetz*, 747 F.Supp. 250 (D.Vt.1990), *aff'd*, 955 F.2d 786 (2d Cir.1992), *cert. denied*, 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992) (*Williams/Jakobetz* test), in determining the reliability of a scientific procedure: (1) the potential rate of error, (2) the existence and maintenance of standards, (3) the care with which the scientific technique has been employed and whether it is susceptible to abuse, (4) whether there are analogous relationships with other types of scientific techniques that are routinely admitted into evidence, (5) the presence of failsafe characteristics, (6) the expert's qualifications and stature, (7) the existence of specialized literature, (8) the novelty of the technique and its relationship to more established areas of scientific analysis, (9) whether the technique has been generally accepted by experts in the field, (10) the nature and breadth of the inference adduced, (11) the clarity with which the technique may be explained, (12) the extent to which basic data may be verified by court and jury, (13) the availability of other experts to evaluate the technique, and (14) the probative significance of the evidence. 73 Haw. at 138–39 n. 5, 828 P.2d at 1280 n. 5.

We now turn to an examination of whether the HGN test principles and procedures are reliable according to the factors outlined in the *Williams/Jakobetz* test.

### 1.  *The Potential Rate of Error*

According to NHTSA studies, the HGN test is the most precise FST, with a seventy-seven percent accuracy rate in detecting individuals with a BAC of 0.10 percent or greater. *1984 NHTSA Instruction Manual, reprinted in* 1 *Defense of Drunk Driving* § 10.99[2], app. at 10–93, and a sixty-five percent accuracy rate in detecting persons with a 0.08 percent BAC or greater. Anacapa Sciences, Inc., NHTSA, *Validation of Standardized Field Sobriety Test Battery at BACs Below 0.10 Percent, Final Report* (1998) at 17 (*NHTSA FSTs Validation Study* ). As discussed above, however, there are other potential causes of nystagmus besides alcohol consumption, prompting critics of the HGN test to raise concerns that a suspect will be misdiagnosed as intoxicated. *See* discussion, *supra* section I. Critics have also questioned the validity of the NHTSA's studies which verify the HGN's accuracy rate. *See, e.g., State v. Witte*, 836 P.2d at 1119–21; 4 Am.Jur. POF 3d § 7, at 452; 1 *Defense of Drunk Driving* § 10.09[6], 10–48 to 10–58. In *State v. O'Key*, the Oregon Supreme Court held that the foregoing concerns were sufficiently mitigated by proper training of police officers to distinguish between "innocent" nystagmus and "alcohol-induced" nystagmus, since "[n]on-alcohol-induced nystagmus ... typically is asymmetrical (one eye only), whereas alcohol-induced nystagmus is the same in both eyes." 899 P.2d at 684. Additionally, the supreme court noted, "part of the training that officers undergo instructs them to ask, before administering the HGN test, whether the person has a head injury, is ill, or is taking medication." *Id., see also* NHTSA, Transportation Safety Institute, DOT, No. DOT HS 178 R 10/95, *DWI [ (Driving While Intoxicated) ] Detection and Standardized Field Sobriety Testing, Student Manual* (1995) (*1995 NHTSA Student Manual* ), *reprinted in part in* 1 *Defense of Drunk Driving* § 10.06[5], at 10–28.

■  In this case, the record includes a written FST report filled out by Officer Evangelista after he had administered the FSTs to Defendant. The report indicates that before administering the FSTs to Defendant, Officer Evangelista asked Defendant certain questions and Defendant responded to the questions as follows:

DO YOU HAVE ANY PHYSICAL DE-
FECTS OR SPEECH IMPEDIMENTS?

YES _____     NO _X_

ARE YOU TAKING ANY MEDI-
CATION?

YES _____     NO _X_

ARE YOU UNDER THE CARE OF A
DOCTOR OR DENTIST FOR ANY-
THING?

YES _____     NO _X_

ARE YOU UNDER THE CARE OF
A[N] EYE DOCTOR?

YES _____     NO _X_

DO YOU HAVE AN ARTIFICIAL OR
GLASS EYE?

YES _____     NO _X_

ARE YOU AN EPILEPTIC OR A DIA-
BETIC?

YES _____     NO _X_

It appears, therefore, that proper precau-
tions were taken to minimize the potential
for error in the HGN test results.

2. *The Existence and Maintenance of
   Standards*

The *1984 NHTSA Instruction Manual,*
the result of exhaustive research studies, sets
forth the applicable standards governing the
administration and scoring of the HGN test.
*1984 NHTSA Instruction Manual, reprinted
in* 1 *Defense of Drunk Driving* § 10.99[2],
app. at 10–90 to 10–98. These standards
were recently refined in the *1995 NHTSA
Student Manual. 1995 NHTSA Student
Manual, reprinted in part in* 1 *Defense of
Drunk Driving* § 10.06[5], at 10–27 to 10–30.

3. *The Care with Which the Scientific
   Technique Has Been Employed and
   Whether It Is Susceptible to Abuse*

As discussed above, the NHTSA publishes
manuals that set forth the proper procedure
for administering and scoring the HGN test.

We agree with the Oregon Supreme Court
that as long as the HGN test is "properly
administered and scored by a qualified offi-
cer, the HGN test does appear to be a fairly
reliable indicator of alcohol impairment."
*State v. O'Key,* 899 P.2d at 684. *See also
Ballard v. State,* 955 P.2d at 940 ("While
HGN testing may not, of itself, be sufficient
to establish intoxication, HGN test results
are admissible as a factor to be considered
by the fact-finder when determining intoxi-
cation.").

As to whether the HGN test is susceptible
to abuse, one of the criticisms leveled at the
test is that it "is wholly subjective—the po-
lice officer has no physical sample to take to
a laboratory. Thus, the suspect is not able
to have his [or her] expert examine the evi-
dence ... [and] cannot contradict the offi-
cer's testimony[.]" Comment, 84 J.Crim. L.
& Criminology at 215. In our view, however,
this concern is minimized as long as the
HGN test results are limited solely to proba-
ble cause determinations.

4. *Whether There Are Relationships with
   Other Types of Scientific Techniques
   That Are Routinely Admitted into Ev-
   idence*

One commentator has compared the HGN
test to hair analysis, *see* Comment, 84
J.Crim. L. & Criminology at 214 n. 99, a
scientific test which the Hawai'i Supreme
Court has already judicially noticed as scien-
tifically reliable and admissible. *Fukusaku,*
85 Hawai'i at 473–74, 946 P.2d at 43–44. The
Comment observes:

Since hair analysis is based on subjective
visual observation and is routinely admit-
ted in court, the HGN test, which is also
based on visual observation, should there-
fore, not necessarily be discounted. Hair
analysis is not an exact science. Techni-
cians are unable to positively conclude that
a hair sample came from a particular indi-
vidual. Thus, a qualified witness on hair
identification and comparison can provide
relevant testimony but cannot make a posi-
tive identification. A "match" means that
two samples share general characteristics,
not that they are identical. Likewise, in
the absence of chemical analyses, police

officers may not testify to an exact BAC level. Just as hair experts can testify that samples were "alike," "similar," or "compatible," the HGN "expert" can say that based on his [or her] observations of the onset of HGN at forty-five degrees, results indicate possible neurological dysfunction, which may be caused by alcohol ingestion.

Comment, 84 J.Crim. L. & Criminology at 214–15 (footnotes omitted).

### 5. The Presence of Failsafe Characteristics

In *Williams*, the Second Circuit Court of Appeals stated that the presence of "failsafe" characteristics, i.e., the likelihood that potential inaccuracies in the results of a scientific test will "more likely ... redound to [a defendant's] benefit than to his [or her] detriment," is a "convincing element in determining reliability" of scientific evidence. 583 F.2d at 1199. The court explained further that

[i]f the attack on accuracy [of the test results] goes only to the weight to be given the evidence, admission to jury consideration would appear proper. If the attack establishes such fundamental inaccuracy as to render the particular ... evidence of no assistance to the jury, the potential to mislead may be so great as to warrant an exclusion order.

*Id.*

In the case of HGN testing, it seems to be undisputed that a correlation exists between alcohol impairment and nystagmus. *See* discussion, *supra* section I. Any attacks on the accuracy of the test results or the administration of the test would therefore go to the weight, rather than its admissibility, of the evidence to establish probable cause of alcohol impairment. *See City of Fargo v. McLaughlin*, 512 N.W.2d at 707 (None of the factors raised by critics of HGN testing, including other potential physiological causes for nystagmus and officer bias, "undercuts the scientific foundation of the test: intoxicated persons exhibit nystagmus, and a properly administered HGN test will identify that nystagmus[;]" rather, these factors "go to the *weight* of the evidence, rather than its admissibility.").

### 6. The Expert's Qualifications and Stature

In this case, although Officer Evangelista testified as to his administration of the test, no expert testimony was offered as to the scientific correlation between HGN testing and alcohol impairment. Pursuant to *Fukusaku*, expert scientific testimony would be unnecessary if the principles underlying HGN testing were overwhelmingly accepted as reliable, *see* 85 Hawai'i at 473, 946 P.2d at 43, and, as our discussion of the case law across the country indicates, the overwhelming majority of courts have accepted these principles as being sufficiently reliable to admit the HGN test results into evidence for the purposes of determining probable cause.

Whether the HGN test results are accurate, however, will depend on whether Officer Evangelista was properly trained to administer the test and actually administered the test properly. This issue is discussed in more detail below.

### 7. The Existence of Specialized Literature

As evinced by the discussion above, as well as the literature referred to in the many cases that have addressed the admissibility of HGN evidence, there is no shortage of specialized scientific and legal literature addressing the underlying scientific theory and methodology of the HGN test.

### 8. The Novelty of the Technique and Its Relationship to More Established Areas of Scientific Analysis

Although the HGN test has not been widely applied in the United States until recently, the test has been in use for over forty years. Annotation, *Horizontal Gaze Nystagmus Test: Use in Impaired Driving Prosecution*, 60 A.L.R.4th 1129 § 2[a], at 1131 (1988). Moreover, the test is used as part of a battery of FSTs prescribed by the NHTSA, and the case law across the country supports the admissibility of HGN test results, as long as the test was properly administered by a qualified officer. The HGN test, under the cir-

cumstances, can no longer be considered novel.

### 9. Whether the Technique Has Been Generally Accepted by Experts in the Field

As discussed above, the theory underlying HGN testing and the scientific acceptability of HGN testing as a means to determine probable cause for DUI have been the subject of many research studies, publications, cases, and medical and legal literature. Based on our review of the material, we agree with the Oregon Supreme Court that

the following propositions have gained general acceptance within the relevant scientific community: (1) HGN occurs in conjunction with alcohol consumption; (2) its onset and distinctness are correlated to BAC; (3) in conjunction with other field sobriety tests (*e.g.*, the walk-and-turn test and the one-leg-stand test), the HGN test is a reliable indicator of whether a driver is impaired by alcohol, and (4) officers can be trained to observe these phenomena sufficiently to detect alcohol impairment.

*State v. O'Key,* 899 P.2d at 686 (footnotes omitted).

We note that of the thirty-seven states that have addressed the admissibility of HGN test results, only Mississippi has explicitly declared that HGN test results are not admissible at trial because the HGN test is "not generally accepted within the scientific community[.]" *Young v. City of Brookhaven,* 693 So.2d at 1360–61. However, even the Supreme Court of Mississippi has held that HGN test results are reliable for purposes of determining probable cause. *Id.* at 1361.

### 10. The Nature and Breadth of the Inference Adduced

"The bulk of the scientific research indicates that the potential error rate of a properly administered HGN test is lower than all [FSTs] that are routinely admitted into evidence." *State v. Ruthardt,* 680 A.2d 349, 360 (Del.Super.Ct.1996). For example, the most recent NHTSA research indicates that the HGN test has a sixty-five percent accuracy rate in detecting suspects with 0.08 percent BAC or higher. *NHTSA FSTs Validation Study* at 17. The walk-and-turn and the one-leg-stand tests, on the other hand, boast only a sixty-one percent and forty-five percent success rate, respectively. *Id.* Although concerns exist about whether a test was properly administered by an officer in the field who was not properly trained, these concerns go to the weight of the evidence rather than its admissibility. *See, e.g., State v. Ruthardt,* 680 A.2d at 360; *City of Fargo v. McLaughlin,* 512 N.W.2d at 707.

### 11. The Clarity with Which the Technique May Be Explained

The HGN test appears relatively easy to administer and explain. *See, supra* note 3.

### 12. The Extent to Which Basic Data May Be Verified by Court and Jury and

### 13. The Availability of Other Experts to Evaluate the Technique

As to factors 12 and 13, the Oregon Supreme Court observed:

The HGN test is based on subjective visual observation. The officer who administers the test has no physical sample to take to a laboratory. A defendant is not able to have an expert examine the evidence. Test conditions cannot be duplicated, and the test results cannot be verified. Thus, a defendant cannot contradict much of the officer's testimony. The validity of HGN test evidence depends in part on the examining officer's ability to administer the test, to interpret the test results, and to relate accurately his or her perceptions.

Nevertheless, observation by an officer of the presence of nystagmus is no more subjective than the observation by an officer of other indicia of alcohol impairment, such as swaying, staggering, having bloodshot eyes, or using slurred speech.

*State v. O'Key,* 899 P.2d at 687 (citations omitted). We concur.

### 14. The Probative Significance of the Evidence

■ Clearly, HGN test results are relevant in a DUI case. As long as the test was properly administered in a particular case,

HGN test results would have probative significance. *See, e.g.,* *State v. O'Key,* 899 P.2d at 687; *Ballard v. State,* 955 P.2d at 940.

■ In light of the foregoing analysis, we conclude that HGN test results have been sufficiently established to be reliable and are therefore admissible as evidence that police had probable cause to believe that a defendant was DUI. Since the issue was not presented, we do not decide whether HGN test results are admissible at trial as evidence of a defendant's intoxication.

B. *Whether the District Court Properly Took Judicial Notice of the Reliability of the HGN Test*

In this case, the district court took judicial notice of the reliability of the HGN test results for establishing probable cause to arrest Defendant for DUI. Defendant maintains that, pursuant to HRE Rule 201(b) (1993),[8] judicial notice may be taken only of "adjudicative facts"—those facts "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Defendant argues that the reliability of the HGN test is not indisputable and therefore does not constitute an "adjudicative fact" of which the district court could properly take judicial notice.

We agree with Defendant that the reliability of the HGN test is not an adjudicative fact. The Hawaiʻi Supreme Court explained in *State v. Puaoi,* 78 Hawaiʻi 185, 190, 891 P.2d 272, 277 (1995), that adjudicative facts are "the kind of facts that are ordinarily decided by the trier of fact; for example, who did what to whom, when, where, how, and why." The reliability of the HGN test clearly does not fall into this category and, therefore, is not an adjudicative fact subject to HRE Rule 201.

The fact that the reliability of the HGN test does not constitute an adjudicative fact under HRE Rule 201 or a matter of law that can be judicially noticed under HRE Rule 202 (1993),[9] however, does not mean that judicial notice cannot be taken of such matter. 21 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5103, at

---

8. HRE Rule 201 (1993) provides, in relevant part:

> **Judicial notice of adjudicative facts.** (a) Scope of rule. This rule governs only judicial notice of adjudicative facts.
>
> (b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> (c) When discretionary. A court may take judicial notice, whether requested or not.
>
> (d) When mandatory. A court shall take judicial notice if requested by a party and supplied with the necessary information.
>
> (e) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.
>
> (f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding.
> . . .

9. HRE Rule 202 (1993) provides:

> · **Judicial notice of law.** (a) Scope of rule. This rule governs only judicial notice of law.

> (b) Mandatory judicial notice of law. The court shall take judicial notice of (1) the common law, (2) the constitutions and statutes of the United States and of every state, territory, and other jurisdiction of the United States, (3) all rules adopted by the United States Supreme Court or by the Hawaii [Hawaiʻi] Supreme Court, and (4) all duly enacted ordinances of cities or counties of this State.
>
> (c) Optional judicial notice of law. Upon reasonable notice to adverse parties, a party may request that the court take, and the court may take, judicial notice of (1) all duly adopted federal and state rules of court, (2) all duly published regulations of federal and state agencies, (3) all duly enacted ordinances of municipalities or other governmental subdivisions of other states, (4) any matter of law which would fall within the scope of this subsection or subsection (b) of this rule but for the fact that it has been replaced, superseded, or otherwise rendered no longer in force, and (5) the laws of foreign countries, international law, and maritime law.
>
> (d) Determination by court. All determinations of law made pursuant to this rule shall be made by the court and not by the jury, and the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under these rules.

481 (1977). As Professors Wright and Graham point out with respect to Federal Rules of Evidence Rule 202, upon which HRE Rule 202 is modeled, "it simply means that no attempt is made to regulate" the taking of judicial notice as to such matters, *id.*, and that "one must look to the decisional law to determine the limits of this kind of judicial notice." *Id.* § 5102, at 463–64. We examine, therefore, whether decisional law supports the district court's action of taking judicial notice of the reliability of the HGN test.

### 1. *The Case Law in Other Jurisdictions*

Courts have long applied the doctrine of judicial notice to scientific evidence and principles. *See* 2 *McCormick on Evidence* § 330, at 393–97 (J. Strong 4th ed.1992). As a general rule, however, "where the admission of testimony on a scientific technique presents an issue of first impression, the technique's reliability is not a proper subject of judicial notice." 29 Am.Jur.2d *Evidence* § 94, at 137 (1994). On the other hand,

> [o]nce a scientific principle is sufficiently established, a court may take judicial notice of the validity of that principle. Similarly, a court may take judicial notice of the validity of the technique applying that principle. In either case the effect is the same: judicial notice relieves the offering party of the burden of producing evidence on these issues.

1 P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 1–2, at 2 (2d ed.1993) (footnotes omitted). An eminent treatise on evidence further points out that

> the [scientific] principle involved need not be commonly known in order to be judicially noticed; it suffices if the principle is accepted as a valid one in the appropriate scientific community. In determining the intellectual viability of the proposition, of course, the judge is free to consult any sources that he [or she] thinks are reliable, but the extent to which judges are willing to take the initiative in looking up the authoritative sources will usually be limited. By and large, therefore, it is the task of counsel to find and to present in argument and briefs such references, excerpts and explanations as will convince the judge

that the fact is certain and demonstrable. Puzzling enough in this regard, it has been noted that "nowhere can there be found a definition of what constitutes competent or authoritative sources for purposes of verifying judicially noticed facts." *And it should be noted, after a number of courts take judicial notice of a principle, subsequent courts begin to dispense with the production of these materials and to take judicial notice of the principle as a matter of law established by precedent.*

2 *McCormick on Evidence* § 330, at 395 (footnotes omitted, emphasis added).

In *Schultz v. State*, the Court of Special Appeals of Maryland, after a thorough review of case law in other states, took "judicial notice of the reliability and acceptance of the HGN test[,]" 664 A.2d at 69, stating:

> In the case *sub judice*, the "fact" at issue is whether the HGN test is generally accepted in the scientific community as a reliable indicator of an increased blood alcohol content. There are a number of sources that may be consulted to determine that issue, including scientific journals and other such literature. Because the test is so frequently, even predominantly, used in a forensic setting, however, there is another, equally reliable, source— the holdings of other courts that have examined the question.
>
> It is not a precondition to taking judicial notice at the appellate level to "reinvent the wheel" in every case. If a sufficient number of courts have examined the relevant evidence presented on the issue in other cases and have concluded from that evidence that the test is, or is not, generally accepted in the scientific community, there is no reason why we have to insist that the same evidence be presented again in the case before us. We can draw our own conclusions from the collection of holdings of our sister (or brother) courts, including those that have found a sufficient basis for taking judicial notice.
>
> * * *
>
> To do otherwise at this stage in the development of the science would leave to individual courts within the twenty-three jurisdictions of this State (and the various

courts and judges within each jurisdiction) to determine, on a case-by-case basis, the scientific reliability of the test. In each of the various jurisdictions, the determination of the reliability and acceptability of such evidence would depend upon the competence, energy, and schedules (and even the budgets) of the various prosecutors throughout the State in obtaining, and producing the attendance of experts at the thousands of trials involving alcohol[-]related offenses in which HGN testing is sought to be admitted. Disparate results and decisions might result in many instances, not from the actual scientific reliability of the tests themselves, but from the differing abilities and resources of prosecutors and the availability of witnesses from the scientific community.

... [T]he great weight of scientific literature supports its reliability and the majority of jurisdictions across the country have declared HGN testing to be reliable. We take judicial notice that the results of HGN testing, if the test is properly given by a qualified officer, are admissible to indicate the presence of alcohol in a defendant.

*Id.* at 71, 74.

On the other hand, in *State v. Torres,* —— N.M. ——, 976 P.2d 20 (1999), the Supreme Court of New Mexico refused to take judicial notice of the reliability of HGN testing because, in accordance with New Mexico case law, "it is improper to look for scientific acceptance only from reported case law [from other jurisdictions]." *Id.* at ——, 976 P.2d at 32 (brackets omitted).

### 2. *Hawai'i Case Law on Judicial Notice*

The Hawai'i Supreme Court has not hesitated in the past to take judicial notice of the validity of underlying scientific principles and the reliability of scientific techniques.

In *Montalbo,* for example, the supreme court took judicial notice of the reliability of the scientific principles and techniques underlying DNA (deoxyribonucleic acid) profiling and upheld the admission of testimony by Federal Bureau of Investigations (FBI) laboratory personnel that (1) a DNA sample found at the scene of a sexual assault crime matched the DNA sample taken from the defendant, and (2) the statistical probability of finding such a DNA match was no greater than one in one thousand. 73 Haw. at 134, 141–43, 828 P.2d at 1278, 1281–82. The supreme court stated:

We find little basis for concern over the theory underlying the statistical evidence. It suffices to say that statistics and the underlying sampling theory are not novel or controversial. We take judicial notice that the DNA paradigm is not controversial and is widely accepted in the relevant scientific community. We also recognize that the basic techniques underlying the analysis used by the FBI are widely accepted. W.C. Thompson & S. Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 Va. L.Rev. 45, 60–61, 64–76 (1989). *See, e.g., People v. Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985, 988–90 (1989) (Theory is unanimously accepted amongst scientists and lawyers and techniques are not novel but it is the transfer of the technique to the context of DNA forensic identification which has generated much of the dispute); *Commonwealth v. Curnin,* 409 Mass. 218, 565 N.E.2d 440, 441 (1991) ("Everyone agrees that the underlying theory and at least the general processes used are accepted in the scientific community").

*Id.* at 141, 828 P.2d at 1281.

Subsequently, in *Fukusaku,* the supreme court essentially took judicial notice of the reliability of hair and fiber evidence. 85 Hawai'i at 473–74, 946 P.2d at 43–44.

In light of the foregoing discussion, it was appropriate for the district court to take judicial notice of the validity of the principles underlying HGN testing and the reliability of HGN test results. Unlike New Mexico, this jurisdiction is not constrained by case law prohibiting our courts from looking to case law from other jurisdictions to determine the reliability of a particular scientific test.

### C. *Whether the HGN Test Was Properly Administered by an Officer Who Had Been Properly Trained to Administer the Test*

Based on the parties' stipulation that Officer Evangelista, who administered the HGN

test to Defendant, "was trained through the standard course . . . at HPD" to administer the test, the district court determined that Officer Evangelista was qualified to testify to the results of Defendant's HGN test.

■ Before HGN test results can be admitted into evidence in a particular case, however, it must be shown that (1) the officer administering the test was duly qualified to conduct the test and grade the test results, *Toyomura*, 80 Hawai'i at 26, 904 P.2d at 911; and (2) the test was performed properly in the instant case. *Montalbo*, 73 Haw. at 140, 828 P.2d at 1281. *See also Schultz v. State*, 664 A.2d at 63; *State ex rel. Hamilton v. City Court*, 799 P.2d at 860; *State v. Taylor*, 694 A.2d at 911–12.

■ In this case, no evidence was adduced that Officer Evangelista was duly qualified to conduct the HGN test and grade the test results. Over Defendant's objection, the district court "assum[ed] that the standard training from HPD is, I've always assumed it to be sufficient so I'll assume he has in fact been qualified to give the test." However, it is not clear what HPD's "standard training" consists of and whether HPD's standard training program meets the requirements of the NHTSA. Therefore, we have no way of knowing the extent and nature of Officer Evangelista's HGN training, whether Officer Evangelista's training was supervised by certified instructors, whether Officer Evangelista was certified to administer the test, and whether Officer Evangelista received periodic retraining to refresh himself on his HGN test administration skills.[10] Furthermore, the fact that Officer Evangelista readily admitted that he does not usually check for the angle of onset of nystagmus while administering the HGN test and did not do so in this case suggests that his training may be suspect.

■ The record also indicates that the HGN test may have been administered im-

properly in the instant case. Indeed, the district court acknowledged that Officer Evangelista's administration of the test may have been "incomplete" because he only performed two parts of the three-part HGN test. Admittedly, Defendant registered lack of smooth pursuit and distinct nystagmus at maximum deviation in both eyes, amounting to a total of four points on a six-point scale. *See* Note, 36 Jurimetrics Journal at 384. Moreover, according to the NHTSA's scoring guidelines for the HGN test, "[i]f you observe four or more clues, it is likely that the suspect's BAC is above 0.10." *1995 NHTSA Student Manual, reprinted in part in* 1 *Defense of Drunk Driving* § 10.06[5], at 10–29.

The foregoing scoring procedures, however, must be read in conjunction with the following admonition from the NHTSA:

[The validation of the FSTs results] applies **ONLY WHEN THE TESTS ARE ADMINISTERED IN THE PRESCRIBED, STANDARDIZED MANNER; AND *ONLY* WHEN THE STANDARDIZED CLUES ARE USED TO ASSESS THE SUSPECT'S PERFORMANCE; AND, *ONLY* WHEN THE STANDARDIZED CRITERIA ARE EMPLOYED TO INTERPRET THAT PERFORMANCE.**

**IF ANY ONE OF THE STANDARDIZED FIELD SOBRIETY TEST ELEMENTS IS CHANGED, THE VALIDITY IS COMPROMISED.**

*1995 NHTSA Student Manual, reprinted in part in* 1 *Defense of Drunk Driving* § 10.06[5], at 10–27 (emphasis in original; footnote omitted).

In light of this warning and the record in this case, we are unable to conclude that Officer Evangelista was duly qualified to administer the HGN test and grade the test results or that he properly administered the HGN test in this instance.

---

**10.** We note that the *1984 NHTSA Instruction Manual* explicitly directs officers to "[p]ractice until you can consistently estimate 45 degrees. Check yourself *monthly* with [an 8" × 15" square template or cardboard with a diagonal line drawn from one corner to another to demark 45 degrees] to be sure that your accuracy has been sustained." *1984 NHTSA Instruction Manual, reprinted in* 1 *Defense of Drunk Driving* § 10.99[2], app. at 10–92 (emphasis added).

## CONCLUSION

Because the district court based the existence of probable cause solely on the HGN test results, we vacate the district court's August 20, 1997 Judgment and remand for further proceedings.