960 P.2d 729

STATE of Hawai'i, Plaintiff–Appellee,

v.

Mark J. BIRDSALL, Defendant–Appellant

No. 20382.

Supreme Court of Hawai'i.

June 29, 1998.

Reconsideration Denied July 30, 1998.

Harrison L. Kiehm, Deputy Public Defender for defendant-appellant.

Artemio C. Baxa, Deputy Prosecuting Attorney,(Arleen Y. Watanabe with him on the brief)for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

Defendant-appellant Mark J. Birdsall appeals from his conviction of: Count II, reckless driving, in violation of HRS § 291–2; Count III, driving under the influence of intoxicating liquor; Count IV, terroristic threatening in the second degree, in violation of HRS § 707–717(1); and Count V, criminal property damage in the first degree, in violation of HRS § 708–820(1).[1] Birdsall raises the following two issues on appeal: (1) that HRS § 702–230[2] is unconstitutional because it prohibits the introduction of evidence that he was voluntarily intoxicated to negative his state of mind; and (2) that there was insufficient evidence to sustain his conviction of criminal property damage in the first degree.

## I. BACKGROUND

On May 20, 1996, the Maui grand jury indicted Birdsall on the five aforementioned counts. The charges against Birdsall arose out of an incident that occurred on January 31, 1996, at the Kahale Beach Club in Kīhei, Maui.

The prosecution's witnesses testified as follows. Francis Ollie Akaka (Akaka), the doorman at the Kahale Beach Club, knew Birdsall, as well as Tammy Hughes, Marsha Wakley–Coy, and Rebecca Adams, as regular customers. On the night in question, Tammy knocked on the door even though the club was closed. Tammy told Akaka that she, Marsha, and Rebecca had been driving home from the club when they noticed that Birdsall was following them. Concerned, they re-

---

1. Birdsall does not appeal his conviction of Count I, driving without a license, in violation of HRS § 286–102.

2. See infra note 4.

turned to the Club, parked in front of the door, and asked Akaka to tell Birdsall to leave them alone and go home.

While Akaka and Tammy were talking, Birdsall drove into the parking lot and parked approximately two stalls away from Tammy's parked car. Akaka told him to go home and to "[l]et the ladies go home." Birdsall then drove around the parking lot and went behind the building, which led Akaka to believe that Birdsall had followed his advice. Akaka then told the three women, who were in Tammy's car at the time, to go home. Within minutes, Birdsall came around the corner in his Jeep Cherokee and rammed Tammy's car.

Akaka testified that the act appeared intentional. Birdsall had approached slowly, and then suddenly sped up when he was fifteen to twenty yards from Tammy's car. The pavement was not wet.

Tammy testified that her friend Marsha had been intimately involved with Birdsall and that, as she was driving the other two women home that evening, she had noticed Birdsall following them.[3] This frightened Tammy's friend Rebecca and, because she did not want Birdsall to know where she lived, she insisted they return to the club to get help. Additionally, Birdsall had driven up behind Tammy's Ford Mustang "real close" and bumped the rear bumper of her car at least four times.

After Akaka had instructed the women to leave, Tammy drove out of the lot, but Birdsall followed her. Frightened, Tammy drove around the corner and returned to the parking lot, with Birdsall still following her. After Tammy parked, Birdsall left again. Shortly thereafter, Tammy heard a screeching noise and saw Birdsall enter the parking lot and drive toward her car. He stopped, backed up, then moved forward and rammed her automobile at an angle, not head on. Birdsall did not attempt to swerve or turn.

Marsha testified, *inter alia*, that she was married and had told Birdsall that she wanted to end their relationship. She stated that

she was so intoxicated at the time of the accident that she only remembered feeling a jolt and having to climb out one of the windows of the Mustang because the doors were wedged shut.

Greg Grisham, a private security patrolman, testified that he had heard the sound of screeching tires and a racing engine. He ran in the direction of the sound and saw a vehicle shoot up South Kīhei Road at a high rate of speed and make a 180-degree turn in the middle of the road. The vehicle then sped back to the parking lot entrance. Grisham stated that it appeared that the driver was angry or upset because he was "really tearing through."

Grisham further testified that, after Birdsall entered the parking lot, he appeared to hesitate, as if he were changing directions to face Tammy's car, and then drove directly into her vehicle. Grisham was approximately thirty feet away and he did not see the brake lights go on Birdsall's car. Grisham then called the police.

The officers who arrived on the scene found the vehicles wedged together. One of the officers testified that Birdsall claimed to have ingested twelve tequilas that evening. The officers also testified that the women had told them Birdsall had rammed their car.

Despite the parties' earlier stipulation that Birdsall did not have a valid driver's license on January 31, 1996, the defense moved for a judgment of acquittal on this count following the prosecution's case-in-chief. The trial court denied the motion.

Birdsall testified in relevant part that he had been very drunk that night and had followed Tammy's car because he was concerned about Marsha's inebriated state and because he had wanted to ask her to go home with him. He remembered striking the car but claimed that it had not been an intentional act. Birdsall was later taken to the hospital to treat a laceration over his eye.

Over defense counsel's objection, the trial court submitted to the jury a standard jury instruction, which provided, *inter alia*, that:

---

**3.** Apparently, Birdsall had approached Marsha several times earlier that evening in an effort to

have her accompany him home.

[e]vidence of the self-induced intoxication of the defendant may not be used to negative the state of mind sufficient to establish an element of the offense. However, evidence of self-induced intoxication of the defendant may be used to prove or negative conduct or to prove state of mind sufficient to establish an element of an offense.

The defense objected on the basis of a recent United States Supreme Court opinion, which counsel argued rendered both the instruction, and the statute upon which it was based, unconstitutional.

The jury found Birdsall guilty on all counts. The trial court sentenced Birdsall as follows: for Counts I and II, a fine of $500 per count; for Count III, license suspension for ninety days, five days incarceration, and a $500 fine; for Count IV, probation for one year; and for Count V, probation for five years, six months incarceration (later modified so that Birdsall could serve it in two-day increments), a $1000 fine, along with standard probation conditions. Thereafter, Birdsall filed this timely appeal.

## II. *DISCUSSION*

### A. *Instruction Regarding Self-Induced Intoxication*

Birdsall first asks this court to overrule its holding in *State v. Souza*, 72 Haw. 246, 813 P.2d 1384 (1991), in light of a *dissenting* opinion in the United States Supreme Court's decision in *Montana v. Egelhoff*, 518

U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). Birdsall contends that, contrary to this court's holding and the legislature's definition, HRS § 702–230 [4] is an evidentiary provision and is, therefore, unconstitutional in its application because it deprives the defendant of presenting relevant evidence regarding the requisite state of mind for the charged offense. Birdsall claims that the trial court erred, inasmuch as it patterned the jury instruction on self-induced intoxication after the statute.

We review constitutional questions under the "right/wrong" standard. *State v. Mendoza*, 82 Hawai'i 143, 145, 920 P.2d 357, 359 (1996) (quoting *State v. Toyomura*, 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995)). Additionally, we have held "that (1) legislative enactments are presumptively constitutional; (2) a party challenging [a statutory scheme] has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *Mendoza*, 82 Hawai'i at 145, 920 P.2d at 359 (quoting *Convention Center Authority v. Anzai*, 78 Hawai'i 157, 162, 890 P.2d 1197, 1200 (1995) (brackets in original)).

In *Souza*, this court rejected the defendant's claim that HRS § 702–230 "deprived him of his right to present a complete defense by preventing the jury from considering relevant evidence relating to his mental state at the time of the offense," the same argument raised by Birdsall. *Souza*, 72 Haw. at 248, 813 P.2d at 1386.

---

4. HRS § 702–230 (1993) provides in pertinent part:

**Intoxication.** (1) Self-induced intoxication is prohibited as a defense to any offense, except as specifically provided in this section.

(2) Evidence of the nonself-induced or pathological intoxication of the defendant shall be admissible to prove or negative the conduct alleged or the state of mind sufficient to establish an element of the offense. Evidence of self-induced intoxication of the defendant is admissible to prove or negative conduct or to prove state of mind sufficient to establish an element of an offense. Evidence of self-induced intoxication of the defendant is not admissible to negative the state of mind sufficient to establish an element of the offense.

(3) Intoxication does not, in itself, constitute a physical or mental disease, disorder, or defect within the meaning of section 704–400.

(4) Intoxication which (a) is not self-induced or (b) is pathological is a defense if by reason of such intoxication the defendant at the time of the defendant's conduct lacks substantial capacity either to appreciate its wrongfulness or to conform the defendant's conduct to the requirements of the law.

HRS § 704–400 provides in pertinent part:

**Physical or mental disease, disorder, or defect excluding penal responsibility.** (1) A person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.

The legislature ... clearly indicated that the purpose of the statute as amended is to prevent defendants who willingly become intoxicated and then commit crimes from using self-induced intoxication as a defense.

. . . .

Contrary to appellant's assertion, the operation of § 702–230 does not deprive a defendant of the opportunity to present evidence to rebut the mens rea element of the crime. The statute merely prohibits the jury from considering self-induced intoxication to negate the defendant's state of mind. Appellant could still have attempted to convince the jury that he did not act "intentionally or knowingly" as required for Murder in the Second Degree. Moreover, the statute does not relieve the State of the burden of establishing that a defendant had the requisite mens rea.

Furthermore, we find that voluntary intoxication is a "gratuitous" defense and not a constitutionally protected defense to criminal conduct. Voluntary intoxication does not result from a disease or defect of the mind, but rather from a state that is voluntarily self-induced. Therefore, the legislature's decision to prohibit the use of self-induced intoxication as a defense does not implicate any recognized constitutional rights.

*The legislature was entitled to redefine the mens rea element of crimes and to exclude evidence of voluntary intoxication to negate state of mind.*

*Id.* (emphasis added).

The United States Supreme Court addressed a similar issue in *Egelhoff.* The defendant in that case had been charged with and convicted of deliberate homicide, which, under Montana law, requires an "intentional" or "knowing" state of mind. 116 S.Ct. at 2016. On appeal to the Supreme Court of Montana, Egelhoff challenged a jury instruction that was based upon a statute that provided that voluntary intoxication may not be used to determine " 'the existence of a mental state which is an element of [a criminal] offense.' " *Id.* at 2016. The state supreme court reversed, ruling that the prosecution had been relieved of its burden to prove

every element of the crime charged beyond a reasonable doubt because Egelhoff had not been allowed to introduce evidence of his intoxication. *Id.*

The United States Supreme Court granted certiorari and, in a plurality opinion, reversed the Montana Supreme Court and upheld the statute. The justices provided diverging analyses of the statute as both an evidentiary matter—because the Supreme Court of Montana had addressed it as such—and as a legislative redefinition of the *mens rea* element. *Id.* at 2020 n. 4.

Justice Scalia, joined by Chief Justice Rehnquist, Justice Kennedy, and Justice Thomas pronounced the judgment of the Court, which stated in pertinent part that

[t]he cornerstone of the Montana Supreme Court's judgment was the proposition that the Due Process Clause guarantees a defendant the right to present and have considered by the jury *"all relevant evidence* to rebut the State's evidence on all elements of the offense charged." Respondent does not defend this categorical rule; he acknowledges that the right to present relevant evidence "has not been viewed as absolute."

. . . .

"Among other things, it is normally 'within the power of the State to regulate procedures under which its laws are carried out,' ... and its decision in this regard is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' "

Respondent's task, then, is to establish that a defendant's right to have a jury consider evidence of his voluntary intoxication in determining whether he possesses the requisite mental state is a "fundamental principle of justice."

Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice.

*Id.* at 2017 (citations omitted) (ellipsis points and emphasis in original).

The plurality opinion noted that lengthy common law tradition "that a drunken offender shall have the same judgment 'as if he were in his right senses' must be understood as precluding a defendant from arguing that, because of his intoxication, he could not have possessed the *mens rea* required to commit the crime." *Id.* at 2018.

Additionally, the Court acknowledged that, during the nineteenth century, a new rule developed, which provided that "in most American jurisdictions, intoxication could be considered in determining whether a defendant was capable of forming the specific intent necessary to commit the crime charged." *Id.* at 2018–19. Nevertheless,

> [t]he burden remains upon respondent to show that the "new common law" rule—that intoxication may be considered on the question of intent—was so deeply rooted at the time of the Fourteenth Amendment (or perhaps has become so deeply rooted since) as to be a fundamental principle which that Amendment enshrined.

> That showing has not been made. Instead of the uniform and continuing acceptance we would expect for a rule that enjoys "fundamental principle" status, we find that fully one-fifth of States either never adopted the "new common-law" rule at issue here or have recently abandoned it.

> It is not surprising that many States have held fast to or resurrected the common-law rule prohibiting consideration of voluntary intoxication in the determination of *mens rea*, because that rule has considerable justification—which alone casts doubt upon the proposition that the opposite rule is a "fundamental principle." A large number of crimes, especially violent crimes, are committed by intoxicated offenders.... Disallowing consideration of voluntary intoxication has the effect of increasing the punishment for all unlawful acts committed in that state, and thereby deters drunkenness or irresponsible behavior while drunk. The rule also serves as a specific deterrent, ensuring that those who prove incapable of controlling violent impulses while voluntarily intoxicated go to prison. And finally, the rule comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences.

*Id.* at 2019–20 (citations and footnotes omitted).

Egelhoff also relied upon *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), arguing that the case enunciated the principle that " 'an essential component of procedural fairness is an opportunity to be heard.' " *Id.* at 2022. He claimed that the exclusion of relevant evidence—his state of self-induced intoxication—to negate state-of-mind, impinged upon his right to due process. The court noted that Egelhoff omitted the very next sentence of the *Crane* opinion, which made clear that "the introduction of relevant evidence can be limited by the state for a 'valid' reason, as it has been by Montana." *Id.*

The Court rejected Egelhoff's argument that the statute in question and the jury instruction shifted the burden of proof and noted that the trial judge had instructed the jury that the prosecution carried the burden of proving guilt beyond a reasonable doubt. *Id.* The plurality explained that, had the prosecution failed to produce evidence of Egelhoff's mental state, the trial would have resulted in an acquittal. *Id.* at 2023. Finally, the justices clarified that, even if the law in question was burden-reducing rather than burden-shifting, this effect was not unconstitutional unless it violated a "fundamental principle of fairness (which, as discussed, this one does not)." *Id.*

Justice Ginsburg, in a separate opinion, concurred in the judgment:

> The Court divides in this case on a question of characterization. The State's law, Mont.Code Ann. § 45–2–203 (1995), prescribes that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense." For measurement against federal restraints on state action, how should we type that prescription? If § 45–2–203 is simply a rule designed to keep out "relevant, exculpatory evidence," as JUSTICE O'CONNOR maintains, ... Montana's law

offends due process. If it is, instead, a redefinition of the mental-state element of the offense, on the other hand, JUSTICE O'CONNOR's due process concern "would not be at issue," . . . for "[a] state legislature certainly has the authority to identify the elements of the offenses it wishes to punish," . . . and to exclude evidence irrelevant to the crime it has defined.

Beneath the labels (rule excluding evidence or redefinition of the offense) lies the essential question: Can a State, without offense to the Federal Constitution, make the judgment that two people are equally culpable where one commits an act stone sober, and the other engages in the same conduct after his voluntary intoxication has reduced his capacity for self-control? For the reasons that follow, I resist categorizing . . . [the Montana statute] as merely an evidentiary prescription, but join the Court's judgment refusing to condemn the Montana statute as an unconstitutional enactment.

*Id.* at 2024 (some brackets in original and some added). Justice Ginsburg went on to explain that Montana's intoxication statute did not appear in that state's evidentiary provisions, but instead had been placed in a chapter entitled "General Principles of Liability" and thereby "embodie[d] a legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions." *Id.* She agreed with the argument that the intoxication statute "extract[s] the entire subject of voluntary intoxication for the *mens rea* inquiry." *Id.* (internal quotation marks omitted) (brackets in original).

Accordingly, . . . [the statute] does not "lighte[n] the prosecution's burden to prove [the] mental-state element beyond a reasonable doubt," as JUSTICE O'CONNOR suggests, . . . for "[t]he applicability of the reasonable-doubt standard . . . has always been dependent on how a State defines the offense that is charged," *Patterson v. New York,* 432 U.S. 197, 211, n. 12, 97 S.Ct. 2319, 2327, n. 12, 53 L.Ed.2d 281 (1977).

Comprehended as a measure redefining *mens rea,* . . . [the statute] encounters no

constitutional shoal. States enjoy a wide latitude in defining the elements of criminal offenses, particularly when determining "the extent to which moral culpability should be a prerequisite to conviction of a crime[.]" When a State's power to define criminal conduct is challenged under the Due Process Clause, we inquire only whether the law "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Defining *mens rea* to eliminate the exculpatory value of voluntary intoxication does not offend a "fundamental principle of justice," given the lengthy common-law tradition, and the adherence of a significant minority of the States to that position today.

*Id.* at 2024–25 (some citations omitted) (some brackets and ellipses in original and some added). Citing *Souza,* Justice Ginsburg explained that other states had upheld comparable statutes as "legislative redefinitions of the mental-state element," rather than as evidentiary rules. *Id.* at 2025.

Justice O'Connor dissented, joined by Justice Stevens, Justice Souter, and Justice Breyer. Justice O'Connor, however, conceded that a state legislature "possesses the authority to define the offenses it wishes to punish. If the Montana legislature chose to redefine this offense so as to alter the requisite mental-state element, the due process problem presented in this case would not be at issue." *Id.* at 2031. In this case, the minority viewed the statute as an evidentiary provision that not only excluded a category of evidence from consideration, namely, voluntary intoxication, but relieved the prosecution from having to prove mental state beyond a reasonable doubt. *Id.* at 2026. It was "this combination of effects [that] violate[d] due process." *Id.* at 2026.

Justice Souter also penned a separate dissent, wherein he acknowledged that a state has the authority to define "the mental element of an offense that evidence of a defendant's voluntary intoxication at the time of commission does not have exculpatory relevance and, to that extent, may be excluded without raising any issue of due process." *Id.* at 2032. Justice Souter explained that he

believed the statute "implicitly accomplished such a redefinition," but, because the Supreme Court of Montana discounted such legislative intent, he felt "bound by the state court's statement of its domestic law." *Id.*; *see also id.* at 2020 n. 4. Nevertheless, Justice Souter acknowledged that, in such circumstances, "[a] State may typically exclude even relevant and exculpatory evidence if it presents a valid justification for doing so," but noted that "Montana has not endeavored . . . to advance an argument to that effect." *Id.*

Justice Breyer, joined by Justice Stevens, dissented separately, and focused primarily on Justice Ginsburg's belief that the Montana statute required that:

> To obtain a conviction, the prosecution must prove only that (1) the defendant caused the death of another with actual knowledge or purpose, or (2) that the defendant killed "under circumstances that would otherwise establish knowledge or purpose 'but for' [the defendant's] voluntary intoxication."

*Id.* at 2024 (citation omitted). Justice Breyer, apparently in disagreement with section (2) of Justice Ginsburg's analysis, responded that the Montana statute, which disallows the use of voluntary intoxication evidence for any reason whatsoever, even to prove requisite mental state, would produce anomalous results, inasmuch as it would allow "irrelevant external circumstances," not state of mind, to prove guilt. *Id.* at 2035. The Hawai'i statute plainly requires the state to prove the requisite state of mind and does not rely on "irrelevant external circumstances," nor does it equate voluntary intoxication with the mental-state element.

Justice Breyer also posed the following question: "If the legislature wanted to equate voluntary intoxication, knowledge, and purpose, why would it not write a statute that plainly says so . . . ?" *Id.* He declined to render an opinion on the constitutionality of such a statute. *Id.*

Significantly, all nine justices concurred that states have the power to redefine the elements of criminal offenses, including *mens rea*, with Justice Scalia and Justice Ginsburg directly citing *Souza* to support this princi-ple. *Id.* at 2020 n. 4, 2024, 2031, 2033 n. 2. Accordingly, we believe that *Egelhoff* supports rather than erodes the holding in *Souza* and reject Birdsall's arguments that we should overrule that decision for the following reasons.

■ First, as the *Egelhoff* plurality explained, states may exclude exculpatory evidence if there exists a valid reason to do so, *id.* at 2022, one such reason being the belief that "one who has voluntarily impaired his own faculties should be responsible for the consequences." *Id.* at 2020. The legislative history of HRS § 702–230 reflects exactly this concept:

> Your Committee believes that when a person chooses to drink, that person should remain ultimately responsible for his or her actions. Your Committee further believes that criminal acts committed while a person is voluntarily intoxicated should not be excused by the application of a defense which would negate the offender's state of mind.

Hse. Conf. Comm. Rep. No. 36–86, in 1986 House Journal, at 928.

Second, the burden of proof is not shifted under HRS § 702–230. The Hawai'i statute does not have the combination of effects that Justice O'Connor believed rendered the Montana statute fatally flawed. The prosecution must still prove every element of the offense, including mental state, beyond a reasonable doubt. Additionally, pursuant to *Souza*, HRS § 702–230 "does not deprive a defendant of the opportunity to present evidence to rebut the *mens rea* element of the crime. The statute merely prohibits the jury from considering self-induced intoxication to negate the defendant's state of mind." *Souza*, 72 Haw. at 249, 813 P.2d at 1386. In the instant case, the trial court instructed the jury on every material element of the offense and explained that the prosecution bore the burden of proving each material element beyond a reasonable doubt.

Finally, unlike the Supreme Court of Montana, as discussed by Justice Souter, this court has specifically found valid legislative reasons for excluding self-induced intoxication as exculpatory evidence, and also has

held that HRS § 702–230 is a penal rather than an evidentiary statutory provision:

> The legislature, in amending § 702–230, clearly indicated that the purpose of the statute as amended is to prevent defendants who willingly become intoxicated and then commit crimes from using self-induced intoxication as a defense.[5]
>
> . . . .
>
> Furthermore, we find that voluntary intoxication is a "gratuitous" defense and not a constitutionally protected defense to criminal conduct.[6]
>
> . . . .
>
> The legislature was entitled to redefine the mens rea element of crimes and to exclude evidence of voluntary intoxication to negate state of mind.

*Souza*, 72 Haw. at 248–49, 813 P.2d at 1386.

In the instant case, the trial court instructed the jury that self-induced intoxication could not be used to negate state of mind sufficient to establish the *mens rea* element of the offense. Such an instruction, derived from HRS § 702–230, has been found to be constitutional by both the United States Supreme Court in *Egelhoff* and by this court in *Souza*. We now reaffirm our earlier decision.

### B. *Sufficiency of the Evidence*

██ Finally, other than his challenge to the constitutionality of HRS § 702–230, Birdsall claims that there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of criminal property damage in the first degree. HRS § 708–820 (1996) provides that "(1) A person commits the offense of criminal property damage in the first degree if . . . [t]he person intentionally damages property and thereby recklessly places another person in danger of death or bodily injury[.]" Birdsall asserts that he

"did not intend to damage Tammy's car as evidence by the fact that [he] did not strike Tammy's car directly."

This argument is patently meritless. Birdsall is merely attempting to retry factual issues on appeal by asking this court to weigh the evidence and find that reasonable doubt exists. We decline to invade the province of the jury in such a manner.

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Quitog*, 85 Hawai‘i 128, 145, 938 P.2d 559, 576 (1997) (quoting *State v. Eastman*, 81 Hawai‘i 131, 135, 913 P.2d 57, 61 (1996)) (emphasis omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Eastman*, 81 Hawai‘i at 135, 913 P.2d at 61.

In the instant case, the jury reasonably could have concluded either through Akaka's, Tammy's, or Grisham's testimony that Birdsall had intended to ram Tammy's car. "[T]he mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances." *State v. Batson*, 73 Haw. 236, 254, 831 P.2d 924, 934 (1992) (citations and internal quotation marks omitted). The jury had the right to discount Birdsall's protestations to the contrary, inasmuch as it "is for the factfinder to assess the credibility of witnesses and to

---

5. Other statutory examples evincing the intent of the legislature to eliminate certain defenses may be found in Chapter 707 of the HRS. Under HRS §§ 707–731 and –732, a person is guilty of sexual assault in the second and third degree respectively if he or she, while employed in a correctional facility, knowingly subjects an imprisoned person

to sexual penetration or contact. The statutes implicitly reject consent to the act by the imprisoned person as a defense.

6. This reasoning is echoed in both the plurality opinion and Justice Ginsburg's concurring opinion, *supra*.

resolve all questions of fact; the [finder of fact] may accept or reject any witness's testimony in whole or in part." *State v. Clark,* 83 Hawai'i 289, 298–99, 926 P.2d 194, 203–04 (1996) (citation omitted) (brackets in original). Accordingly, we hold that there was sufficient evidence to sustain Birdsall's conviction.

III. *CONCLUSION*

For the foregoing reasons, we affirm Birdsall's convictions.