15 P.3d 314

STATE of Hawai'i, Plaintiff–Appellee,

v.

Preston MITCHELL, Defendant–
Appellant.

No. 22217.

Intermediate Court of Appeals of Hawai'i.

Dec. 12, 2000.

Jon N. Ikenaga, Deputy Public Defender, on the briefs, for defendant-appellant.

Richard K. Minatoya, Deputy Prosecuting Attorney, County of Maui, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

Defendant–Appellant Preston Mitchell (Mitchell) appeals the December 30, 1998 judgment of the district court of the second circuit, in which the court, upon a bench trial of even date, convicted him of driving under the influence of intoxicating liquor (DUI), in violation of Hawai'i Revised Statutes (HRS) § 291–4(a)(1),[1] and of inattention to driving, in violation of HRS § 291–12.[2]

For the following reasons, we affirm.

## I. Background.

On May 2, 1998, at approximately 4:18 p.m., Officer Lance Kaupalolo (Officer Kaupalolo) was called to the scene of a two-car accident on Walaka Street at South Kihei Road in Wailuku, Maui. Upon his arrival, Officer Kaupalolo observed two cars—one white, two-door sedan and a red compact—partially blocking the roadway. He noted rear-end damage to the red car and front-end damage to the white car.

Officer Kaupalolo spoke to the driver of each vehicle. Officer Kaupalolo asked Mitchell if he was the driver of the white sedan and if he had any injuries. Mitchell identified himself as the driver and said that he had no injuries.

Officer Kaupalolo testified that Mitchell appeared to be a little agitated. Mitchell's speech was slurred and he had difficulty standing. Officer Kaupalolo opined that these are possible signs of impairment.

Officer Kaupalolo asked Mitchell for his insurance papers, which Mitchell provided.

After seeing the signs of impairment, Officer Kaupalolo asked Mitchell to "lean up against his car, have a seat near the ground, while we try and move the vehicles off of the roadway, or at least try and clear a path for

traffic." At this time, Officer Ruel Dalere (Officer Dalere) arrived on the scene to assist. Officer Dalere spoke with Mitchell while Officer Kaupalolo tended to the other vehicle.

On cross-examination, Officer Kaupalolo admitted that he had not, in so many words, indicated in his accident report that Mitchell was the driver of the white sedan. However, he explained that if he identified an individual in his report, it means he identified the operator of the vehicle in question or a possible operator. Officer Kaupalolo wrote Mitchell's name in Box 17 of his report, indicating the operator's name.

The State's next witness, Officer Dalere, testified that he has worked for the Maui Police Department for six years and had received training in DUI detection at a DUI class. Officer Dalere heard the police radio transmission regarding the accident and responded in order to assist.

Upon arriving at the scene, Officer Dalere saw Mitchell by the front fender of his white sedan. Officer Dalere observed front-end damage to the white sedan.

After Officer Kaupalolo briefed him on the incident, Officer Dalere approached Mitchell. Mitchell appeared very unstable on his feet. Officer Dalere detected an odor of liquor coming from Mitchell's mouth. Mitchell was swaying from side to side. Officer Dalere saw Mitchell lean against the front fender of his vehicle. Officer Dalere later testified that Mitchell appeared to have difficulty walking.

When Officer Dalere asked Mitchell if he had been drinking, Mitchell yelled "No" and became very hostile. Because of the odor of liquor coming from Mitchell's mouth, Officer Dalere repeatedly asked Mitchell if he had been drinking. However, Mitchell was un-

---

1. Hawai'i Revised Statutes (HRS) § 291–4(a)(1) (Supp.1999) provides that "[a] person commits the offense of driving under the influence of intoxicating liquor if ... [t]he person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor, meaning that the person concerned is under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty[.]"

2. HRS § 291–12 (1993) provided that "[w]hoever operates any vehicle without due care or in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property shall be fined not more than $500 or imprisoned not more than six months, or both."

cooperative and yelled, accusing Officer Dalere of "picking on the haole" or something to that effect.

Officer Dalere had to repeatedly ask Mitchell to remove his sunglasses. When Mitchell finally complied, Officer Dalere observed that Mitchell's eyes were red, bloodshot and watery. Officer Dalere opined that these are signs of intoxication.

Mitchell denied imbibing, but mentioned that he had medical problems and was taking pain medication for his back and knees. Officer Dalere testified that the Mitchell's pain medication was medication "[t]hat he obviously got from his dad that wasn't prescribed to him."

Mitchell did not say that he had been injured in the accident.

Officer Dalere asked Mitchell to take a field sobriety test (FST). Mitchell refused to do the one-leg stand or the walk-and-turn, but he did participate in the horizontal gaze and nystagmus test (HGN). With respect to the HGN, Officer Dalere testified that he was checking for lack of smooth pursuit of the object being presented when tracked by the eye, onset before 45 degrees and maximum deviation at 45 degrees.

Officer Dalere then explained that he had received training in the HGN test through the DUI class and that he had conducted close to one hundred HGN tests. The DUI trainer was a certified DUI instructor, Officer Champ Wright.

While conducting the HGN test on Mitchell, Officer Dalere detected six clues of intoxication, which he noted on the field sobriety test checklist. Officer Dalere determined from Mitchell's performance on the HGN test that he was impaired while operating his vehicle, and that he was in no condition to drive.

Mitchell refused to participate in any further FST. Officer Dalere then advised Mitchell that he was going to be placed under arrest for DUI.

On cross-examination, Officer Dalere admitted that Officer Kaupalolo had informed him Mitchell was driving the car responsible for the accident. He had not himself seen Mitchell driving. Officer Dalere did not ask Mitchell if he had been driving, and Mitchell did not volunteer any information to that effect. Officer Dalere also admitted that it was possible Mitchell was leaning on the car because of the effects of the accident, and swaying from side to side due to the medications he said he had taken.

Mitchell testified in his defense that he was a passenger in his car, which was being driven by Mike Crawford (Crawford). Mitchell described Crawford as someone he has known off and on for about four or five years, from parties and get-togethers.

Mitchell testified that he and Crawford had come from the Kamaole III, where they had been "[s]itting, getting together with a few people, just having a couple of beers." Mitchell had taken medication earlier for his back and heel, and was in no condition to drive, so he allowed Crawford to drive him home.

After the accident occurred, Crawford left the car and ran away. Mitchell did not know why. Mitchell was not able to find Crawford before the trial.

Mitchell testified that when the police arrived at the scene, he informed them that he had not been driving the white sedan. From that point on, he claimed, the police officers harassed him.

On cross-examination, Mitchell testified that he was under the influence of Vicoset at the time of the accident, a medication that is prescribed to him. However, Mitchell did not have the prescription with him at the time of his trial.

Mitchell characterized Crawford as an acquaintance. He said he thought he knew where Crawford lived at the time of the accident, but apparently Crawford had since moved. When asked if he remembered what Crawford's address had been, Mitchell replied, "No. Where he used to live or where I thought he lived, 143—143 Nanamu (phonetic)—I think I'm saying it right—Street, in Kihei."

Neither the State nor the defense called any other witnesses.

The court found Mitchell guilty as charged:

All right, Mr. Mitchell, I'll find that from the evidence presented that you were driving the car, that you rear ended the car that stopped in front of you, that you were under the influence at that time of intoxicating liquor.

I find you guilty of the offense of driving under the influence of intoxicating liquor and inattention to driving.

Mitchell filed a timely notice of appeal on January 20, 1999.

## II. Issues Presented.

Mitchell contends on appeal that:

1. The court erred in proceeding to bench trial without obtaining from him a valid waiver of his right to a jury trial;

2. The court erred in admitting the HGN test results as substantive evidence of intoxication;

3. There was insufficient evidence to find him guilty of DUI; and

4. There was insufficient evidence to find him guilty of inattention to driving.

## III. Standards of Review.

*A. Question of Constitutional Law.*

■ " 'We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard.' " *State v. Ferm,* 94 Hawai'i 17, 22, 7 P.3d 193, 198 (App.2000) (quoting *State v. Hanapi,* 89 Hawai'i 177, 182, 970 P.2d 485, 490 (1998)).

*B. Admission of Opinion Testimony.*

■ In Hawai'i, admission of opinion [testimony] is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal.... Generally, to constitute an abuse [of discretion,] it must appear that the [trial] court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Toyomura,* 80 Hawai'i 8, 23–24, 904 P.2d 893, 908–09 (1995) (citations omitted).

*C. Sufficient Evidence to Support a Conviction.*

■ The courts " 'have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury.' " *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (quoting *State v. Batson,* 73 Haw. 236, 248, 831 P.2d 924, 931, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992)). Substantial evidence is "evidence which a reasonable mind might accept as adequate to support the conclusion of the fact finder." *State v. Gabrillo,* 10 Haw.App. 448, 459, 877 P.2d 891, 896 (1994) (quoting *State v. Lima,* 64 Haw. 470, 475, 643 P.2d 536, 539 (1982)) (internal quotation marks and brackets omitted). Matters related to the credibility of witnesses and the weight to be given to the evidence are generally left to the factfinder. *Id.* at 457, 877 P.2d at 895. The appellate court will neither reconcile conflicting evidence nor interfere with the decision of the trier of fact based on the witnesses' credibility or the weight of the evidence. *Id. See also State v. Hopkins,* 60 Haw. 540, 542, 592 P.2d 810, 812 (1979) (stating that it was up to the trial judge as factfinder to assess the credibility of witnesses, including the defendant and resolve all questions of fact). Thus, we need not necessarily concur with a trial court's particular finding in order to sustain a conviction.

*State v. Medeiros,* 80 Hawai'i 251, 261–62, 909 P.2d 579, 589–90 (App.1995).

## IV. Discussion.

*A. Mitchell Knowingly, Intelligently and Voluntarily Waived His Right to a Jury Trial.*

Mitchell argues that his colloquy with the court, at his arraignment and plea on June 30, 1998, insufficiently informed him of his right to a jury trial. As a result, he did not

knowingly and voluntarily waive that right. We disagree.

■ Hawai'i Rules of Penal Procedure (HRPP) Rule 5(b)(1) (1999) provides that the district court "shall in appropriate cases inform the defendant of the right to jury trial in the circuit court or that the defendant may elect to be tried without a jury in the district court." " 'Appropriate cases' arise whenever the accused has a constitutional right to a jury trial." *State v. Friedman*, 93 Hawai'i 63, 68, 996 P.2d 268, 273 (2000) (*citing State v. Ibuos*, 75 Haw. 118, 120, 857 P.2d 576, 577 (1993)); *see also* article I, section 14, of the Hawai'i Constitution (1978) and the sixth amendment to the United States Constitution.

The statutory right to a jury trial arises whenever a criminal defendant can be imprisoned for six months or more. HRS § 806–60. Because an inattention to driving conviction carried a potential sentence of up to six months in prison at the time of Mitchell's arrest, Mitchell had a right to trial by jury. The State concedes that Mitchell had a statutory and a constitutional right to a jury trial. *See State v. Lindsey*, 77 Hawai'i 162, 165, 883 P.2d 83, 86 (1994).

■ A defendant may, orally or in writing, voluntarily waive his or her right to trial by jury. In order to obtain a valid waiver, the court is required to inform the defendant of that constitutional right. The failure to obtain a valid waiver constitutes reversible error. *Friedman*, 93 Hawai'i at 68, 996 P.2d at 273.

A waiver is the knowing, intelligent, and voluntary relinquishment of a known right. Thus, [t]o determine whether a waiver was voluntarily and intelligently undertaken, this court will look to the totality of facts and circumstances of each particular case. Where it appears from the record that a defendant has voluntarily waived a constitutional right to a jury trial, the defendant carries the burden of demonstrating by a preponderance of the evidence that his/her waiver was involuntary.

*Id.* at 68–69, 996 P.2d at 273–74 (citations and internal quotation marks omitted). As will become evident, *infra*, it appears from the record that Mitchell voluntarily waived his right to a jury trial. Hence he bears the burden of demonstrating by a preponderance of the evidence that his waiver was involuntarily given.

Mitchell contends that his brief colloquy with the court was insufficient to ensure or to demonstrate that he fully understood all of the rights connected with a jury trial and the ramifications of waiving those rights. The following exchange took place at Mitchell's arraignment:

[DEFENSE COUNSEL]: My client has been advised of his right to a jury trial.

On inattention to driving charge, we're going to waive that right, wish to enter a plea of not guilty and set this matter for bench trial.

THE COURT: Mr. Preston [sic], you have a right to a trial by jury. If you waive that right the case is decided by the judge alone, not by 12 people.

Do you wish to have a trial by jury?

[MITCHELL]: No, sir.

THE COURT: All right. Set the matter for trial.

Mitchell contends that his jury waiver could not have been voluntary or knowing because the court did not inform him that the twelve people comprising the jury would be community members, that a jury's verdict must be unanimous, and that he could participate in jury selection. Furthermore, he claims, the court failed to ascertain whether he was freely choosing to waive a jury trial.

However, in light of the totality of the circumstances, Mitchell has not pointed to any salient fact in the record which suggests that his oral waiver of a jury trial was not voluntary and knowing.

Admittedly, the colloquy was brief and Mitchell responded only with a simple "No, sir" to the court's questioning. However, the record reflects that Mitchell was represented by competent counsel who informed the court that he had advised Mitchell of his right to a jury trial. The court personally informed Mitchell that a judge, rather than a jury of twelve people, would try his case if he waived his jury trial right.

The court did not discuss with Mitchell any other factors relating to a jury trial, but Mitchell does not point to any fact in the record indicating that he was unable to fully understand and voluntarily waive his jury trial right.

Mitchell cites *United States v. Duarte–Higareda*, 113 F.3d 1000 (9th Cir.1997), to support his contention that an invalid waiver results when the trial court fails to cover all four aspects of a jury trial, as set forth in that case. The Ninth Circuit held that, in order to ensure a voluntary waiver in that particular case, the lower court should have personally informed the defendant that "(1) twelve members of the community compose a jury, (2) the defendant may take part in jury selection, (3) a jury verdict must be unanimous, and (4) the court alone decides guilt or innocence if the defendant waives a jury trial." *Id.* at 1002 (citation omitted).

However, in discussing this very issue, the Hawai'i Supreme Court has declined to accept the contention that a *Duarte–Higareda* colloquy is constitutionally required in every case:

> In *Duarte–Higareda*, the defendant, who was not fluent in English, had signed a jury waiver form, preprinted entirely in English, but the record was silent as to whether the written waiver had been translated into Spanish for him. 113 F.3d at 1002. Subsequently, at his arraignment, defendant's counsel also informed the district court that defendant wished to waive his right to a jury trial. *Id.* Although a Spanish interpreter was present to assist the defendant, the district court never directly addressed the defendant to verify his understanding of the jury waiver. The defendant was found guilty following a bench trial and then appealed. *Id.*
>
> The United States Court of Appeals for the Ninth Circuit vacated the conviction and sentence, stating that the record indicated that the defendant possessed the "special disadvantage or disability" of not speaking English, which bore upon his ability to understand the waiver of a jury trial, thereby requiring the district court to conduct a colloquy with the defendant to ensure a voluntary waiver. *Id.* at 1003.

> Thus, the language barrier was a " 'salient fact' that gave notice to the district court that Duarte's waiver 'might be less than knowing and intelligent.' " *Id.* The Ninth Circuit noted that, to ensure a voluntary waiver, the district court should have directly informed the defendant that "(1) twelve members of the community compose a jury, (2) the defendant may take part in jury selection, (3) a jury verdict must be unanimous, and (4) the court alone decides guilt or innocence if the defendant waives a jury trial." *Id.* at 1002 (citing [*U.S. v.*] *Cochran*, 770 F.2d [850] at 853 [(9th Cir.1985)]).

*Friedman*, 93 Hawai'i at 69, 996 P.2d at 274.

Mitchell's is not a *Duarte–Higareda* case. He has not claimed a similar "special disadvantage or disability," nor has he otherwise pointed to any "salient fact" that would indicate an inability to understand or tender a constitutionally effective jury trial waiver. Indeed, he nowhere actually claims that he failed to comprehend his jury trial waiver. His argument is that the lack of a *Duarte–Higareda* colloquy renders a waiver *ipso facto* uninformed and invalid.

Mitchell's is very much a *Friedman* case. In *Friedman*, the defendant argued that his jury trial waiver could not be voluntary or knowing because the trial court failed to specifically advise him that a jury is comprised of twelve members, that he could take part in jury selection, and that a jury verdict must be unanimous. However, the supreme court rejected Friedman's contention that the *Duarte–Higareda* colloquy is constitutionally required in every case, adopting instead a "totality of the circumstances" review of a defendant's waiver of a jury trial. *Friedman*, 93 Hawai'i at 69, 996 P.2d at 274.

The *Friedman* court observed that (1) Friedman had articulated to the trial court that a jury trial is one in which the outcome is decided by twelve adults instead of a judge; (2) the trial court had informed Friedman that a judge would be trying his case if he waived his right to a jury trial; (3) at the arraignment, Friedman was represented by competent counsel, who informed the court that he had previously explained to Friedman the differences between a jury tri-

al and a bench trial; (4) Friedman had acknowledged his attorney's representation; and (5) Friedman had affirmatively indicated to the trial court that his waiver of his jury trial right was voluntary and a result of his own reflection. *Id.* at 70, 996 P.2d at 275.

The supreme court held that Friedman had not presented any "salient fact" bearing upon his ability to understand his jury trial waiver that would have created the need for a more extensive colloquy with the trial court. Hence he had not met his burden of demonstrating that his waiver was involuntary. *Id.*

 In this case, the court personally informed Mitchell that he had a right to a jury trial, and that if he waived that right, his trial would be decided by a judge rather than by twelve people. His attorney informed the court that he had advised Mitchell of his right to a jury trial and Mitchell made no demurral to his attorney's comment. The court personally asked Mitchell if he was waiving trial by jury, and Mitchell responded in the affirmative, in no uncertain terms.

Based on the totality of the circumstances, Mitchell has not met his burden of demonstrating that his waiver was unaware or involuntary. He has not pointed to any "salient fact" indicating an inability to understand or to make a constitutionally effective waiver of his jury trial right, that would have created the need for an extensive colloquy by the court. *Friedman* at 70, 996 P.2d at 275. Therefore, the court properly accepted Mitchell's waiver of his right to a jury trial.

### B. The Court Did Not Err in Convicting Mitchell of DUI.

In order to convict Mitchell of DUI, the State had to prove, beyond a reasonable doubt, that (1) Mitchell (2) operated or assumed actual physical control of the operation of any vehicle while (3) under the influence of intoxicating liquor in an amount sufficient to impair his normal mental faculties or ability to care for himself and guard against casualty. HRS § 291–4(a)(1); *State v. Vliet,* 91 Hawai'i 288, 292, 983 P.2d 189, 193 (1999).

Mitchell contends that the trial court erred in finding him guilty of DUI because the State failed to present substantial evidence that he had operated his vehicle while under the influence of intoxicating liquor, pursuant to HRS § 291–4.

Specifically, Mitchell argues that the court erred in admitting Officer Dalere's testimony on the HGN test results without proper foundation and as substantive evidence of intoxication. He goes on to assert that, without the improperly admitted HGN test results, there was insufficient evidence to convict him of DUI.

We agree that the court erred in admitting testimony on the HGN test results. We decide, however, that the error was harmless beyond a reasonable doubt. *Toyomura,* 80 Hawai'i at 27, 904 P.2d at 912. By the same token, we conclude there was sufficient evidence to convict Mitchell of DUI.

Mitchell contends that "there was insufficient foundation that Officer Dalere was duly qualified to conduct the HGN test and to grade the results." We agree that the court abused its discretion in admitting Officer Dalere's testimony without proper foundation.

In *Toyomura,* a DUI case involving a similar issue of insufficient foundation, the Hawai'i Supreme Court concluded that

insufficient foundation was laid to permit [the arresting officer], *based on Toyomura's performance of the FSTs,* to render a lay opinion as to whether he was intoxicated, inasmuch as the prosecution elicited no testimony establishing that (1) the horizontal gaze nystagmus, "one-leg stand," and "walk-and-turn" procedures were elements of the HPD's official FST protocol, (2) there was any authoritatively established relationship between the manner of performance of these procedures and a person's degree of intoxication, and (3) [the arresting officer] had received any specific training in the administration of the procedures and the "grading" of their results.

*Id.* at 26, 904 P.2d. at 911 (emphasis in the original).

 We have previously held that the results of a HGN test are probative of proba-

ble cause, provided that the HGN test was properly administered. "[W]e conclude that HGN test results have been sufficiently established to be reliable and are therefore admissible as evidence that police had probable cause to believe that a defendant was DUI." *State v. Ito*, 90 Hawai'i 225, 241, 978 P.2d 191, 207 (App.1999). However,

> [b]efore HGN test results can be admitted into evidence in a particular case, . . . it must be shown that (1) the officer administering the test was duly qualified to conduct the test and grade the test results; and (2) the test was performed properly in the instant case.

*Id.* at 244, 978 P.2d at 210 (citations omitted).

In *Ito*, the State had presented no evidence that the police officer in that case was duly qualified to conduct the HGN test and grade the results. The trial court had assumed that the standard police training was sufficient and that the officer was thereupon qualified to administer the HGN test. On appeal, we were unable to conclude that the officer was duly qualified to administer the HGN test and grade the results because

> it is not clear what HPD's [the Honolulu Police Department] "standard training" consists of and whether HPD's standard training program meets the requirements of the NHTSA [National Highway Transportation Safety Administration]. Therefore, we have no way of knowing the extent and nature of [the officer's] HGN training, whether [the officer's] training was supervised by certified instructors, whether [the officer] was certified to administer the test, and whether [the officer] received periodic retraining to refresh himself on his HGN test administration skills.

*Id.* at 244, 978 P.2d at 210.

■ In this case, the State similarly failed to lay a proper foundation for Officer Dalere's HGN test opinion, despite having elicited some foundational testimony from the witness. At trial, the State inquired into Officer Dalere's DUI training on direct examination:

Q [STATE]. Have you received any training in DUI detection?

A [OFFICER DALERE]. Yes, sir.

Q [STATE]. What training did you receive?

A [OFFICER DALERE]. We attend a DUI class. This was instructed by, I believe it was Officer Champ Wright at the time.

The State then asked:

Q [STATE]. Okay. What is the horizontal gaze and nystagmus?

A [OFFICER DALERE]. We're checking for jerkiness of the eye. In this case I detected six clues.

Q [STATE]. Okay. Did you give instruction to [Mitchell] regarding the—

A [OFFICER DALERE]. I did. Again, very uncooperative, didn't want to partake in the maneuver.

Q [STATE]. What were these instructions as far as the—

A [OFFICER DALERE]. The test?

Q [STATE]. Yeah?

A [OFFICER DALERE]. Okay. We would check for smooth pursuit, lack of smooth pursuit of the object being presented when being tracked by the eye, onset before 45 degrees, and maximum deviation at 45 degrees.

Q [STATE]. Okay. And have you had any training in the horizontal gaze and nystagmus?

A [OFFICER DALERE]. Yes, I did.

Q [STATE]. What kind of training did you receive?

A [OFFICER DALERE]. Again, this is through the DUI class that we have with patrol.

Q [STATE]. And, how many horizontal gaze and nystagmus tests have you conducted in the past?

A [OFFICER DALERE]. Have I conducted in the past? Several.

If I give you a number, I'd say close to, maybe, a hundred.

Q [STATE]. Okay. Have you ever administered the horizontal gaze and nystagmus to sober people?

A [OFFICER DALERE]. Yes. It's part of our training. Yes.

Q [STATE]. And from that training they don't have the jerkiness of the eyes?

A [OFFICER DALERE]. That's what we track for, yeah. If the person's obviously impaired, been drinking, you will detect that jerkiness of the eye, like I said, lack of pursuit, the object being presented, okay, to track that object.

Q [STATE]. So what other kind of training did you receive concerning the horizontal gaze and nystagmus?

A [OFFICER DALERE]. It's part of the DUI class format. The gaze and nystagmus is just one of the maneuvers for the field sobriety. I had training with the DUI, again, with Officer Champ Wright.

Q [STATE]. Okay.

A [OFFICER DALERE]. And, Officer Champ Wright, by the way, is a certified DUI instructor.

Q [STATE]. So when you administered the horizontal gaze and nystagmus to the defendant, how many clues did you observe?

A [OFFICER DALERE]. I recall six, as I marked it on the field sobriety maneuver checklist.

Q [STATE]. And [Mitchell] refused to—

A [OFFICER DALERE]. He refused to partake in any of the other two, the one-leg and the walk and turn.

Q [STATE]. Okay. And from your observations of taking the horizontal gaze and nystagmus of the defendant, what does that indicate to you?

A [OFFICER DALERE]. That he was impaired while operating his motor vehicle.

The State did not, however, elicit any testimony as to whether the training Officer Dalere received meets the requirements of the NHTSA. Officer Dalere did not explain the nature and extent of the training except to say that the HGN training is part of the HPD DUI class taught by a certified instructor. Officer Dalere did explain the standardized clues he looks for as indicators of HGN; however, he did not testify that he was certified to administer the HGN test, or that he received periodic retraining to refresh himself on his HGN test administration skills. *See id.* at 244, 978 P.2d at 210.

Therefore, the court erred in permitting Officer Dalere to opine that Mitchell had failed the HGN test, because a proper foundation for the evidence had not been established. Having so concluded, we need not address Mitchell's argument regarding whether the HGN test was performed properly.

 This defect does not, however, warrant vacating Mitchell's DUI conviction.

First, there is no indication that the court relied on the HGN test results in reaching its verdict. In finding Mitchell guilty of DUI, the court stated, in pertinent part:

All right, Mr. Mitchell, I'll find that from the evidence presented that you were driving the car, that you rear ended the car that stopped in front of you, that you were under the influence at that time of intoxicating liquor.

I find you guilty of the offense of driving under the influence of intoxicating liquor and inattention to driving.

Nowhere does the record indicate that the court relied on Officer Dalere's HGN testimony in finding Mitchell guilty of DUI. Nor does the record indicate that the court considered the HGN test results as substantive evidence of intoxication. "It is well established that a judge is presumed not to be influenced by incompetent evidence." *State v. Antone,* 62 Haw. 346, 353, 615 P.2d 101, 107 (1980); *Vliet,* 91 Hawai'i at 298, 983 P.2d at 199 ("[g]iven the absence of a jury in the case at bar, and in light of the substantial evidence contained in the record," there was no reasonable possibility that the erroneously admitted police testimony might have contributed to conviction) (citation omitted). Nothing in the record rebuts the presumption that the court did not rely upon the HGN test evidence in finding Mitchell guilty.

 Second, there was a wealth of overwhelming and compelling evidence at trial that Mitchell was under the influence of intoxicating liquor, which rendered the error nugatory:

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. "Where there is a wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt, errors in the admission or exclusion of evidence are deemed harmless."

*Toyomura*, 80 Hawai'i at 27, 904 P.2d at 912 (citations omitted).

Officer Kaupalolo testified that Mitchell "seemed to be a little agitated. He was also slurring and had difficulty standing." Officer Kaupalolo described these as possible signs of impairment.

Officer Dalere recounted his observations of Mitchell:

A [OFFICER DALERE]. Like I stated, as I approached him at the scene, I detected an odor of liquor coming from his mouth. He was unstable on his feet, swaying side to side. I observed him leaning against the front fender of his vehicle.

Q [STATE]. Did you ask him if he had been drinking?

A [OFFICER DALERE]. Yes. He yelled out no. At which time became [sic] very hostile.

. . . .

A [OFFICER DALERE]. I repeatedly asked him if he had been drinking. I asked him several times because I did detect odor of liquor coming from his mouth. He didn't want to cooperate. He was very uncooperative, like I said, belligerent, yelling at me, saying, you're Filipino and you're picking on the haole. Something to that effect.

Q [STATE]. Were you able to observe the defendant's eyes at that time?

A [OFFICER DALERE]. He had sunglasses, a pair of sunglasses on at the time, as I recall it. Again, several times I advised to take it off. He didn't want to listen. He didn't want to take his sunglasses off. I finally got him to take the sunglasses off, and then I saw his eyes being red, bloodshot, watery.

. . . .

Q [STATE]. What does that indicate to you?

A [OFFICER DALERE]. Signs of intoxication.

Q [STATE]. Did [Mitchell] make any statements to you regarding the odor of liquor on his breath?

A [OFFICER DALERE]. He kept saying no, that he didn't drink.

He mentioned that he had medical problems, that he was taking some kind of pain killer medication. That he obviously got from his dad that wasn't prescribed to him.

Q [STATE]. At this point what is your determination of the status of the defendant concerning his impairment?

A [OFFICER DALERE]. Well, like I said, initial contact, I detected odor.

He also mentioned that he took drugs for pain.

Q [STATE]. Okay.

A [OFFICER DALERE]. I'm not a trained DRE [sic—presumably, drug recognition expert] tester. I'm out on the field, so I wouldn't be able to conduct that test.

Q [STATE]. But from what you saw, were those indications of intoxication?

A [OFFICER DALERE]. Impairment. Yes.

The testimonies of the police officers painted a classic portrait of intoxication. Mitchell's breath was redolent of alcohol. His speech was slurred. His eyes were red, bloodshot and watery. He was hostile and belligerent. He had difficulty walking. He was swaying and unsteady on his feet; indeed, he had difficulty standing and instead leaned against his vehicle.

▓▓▓▓ In addition, Mitchell admitted that he had been drinking before the accident—"just having a couple of beers"—and that he was in no condition to drive. Though Mitchell attributed his inability to drive to medication, the influence of the medication is immaterial under the law. "[W]here a defendant's intoxication is due in any part to alcohol, it is immaterial that the defendant might also have been affected by other drugs."

*Vliet*, 91 Hawai'i at 294, 983 P.2d at 195. As the *Vliet* court also noted, "[n]othing in the [DUI] statute requires that alcohol be the sole or exclusive cause of a defendant's impairment. Rather, what is required is proof beyond a reasonable doubt that liquor contributed to the diminishment of the defendant's capacity to drive safely." *Id.* at 293, 983 P.2d at 194. Mitchell's admissions provided—in and of themselves and in spite of their exculpatory intent—all of the required proof.

Finally, we cannot ignore the circumstances of the accident. When combined with the evidence of extreme intoxication, evidence that Mithell's car rear-ended another vehicle crowns the conclusion that there was "a wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt[.]" *Toyomura*, 80 Hawai'i at 27, 904 P.2d at 912 (citation omitted). Given such a conclusion, we can conclude that the court's error in admitting evidence of the HGN test results was harmless beyond a reasonable doubt.

We acknowledge in this respect that Mitchell vigorously disputed that he was the driver of the white sedan; indeed, it is safe to say that his primary defense was that his acquaintance Crawford was the driver. Be that as it may, it has no relevance to our inquiry into whether the court's error was harmless beyond a reasonable doubt. Error in admitting the HGN test results, which goes only to the issue of impairment, can have no effect upon the issue of identity.

Hawai'i cases support our approach to the court's evidentiary error. In *State v. Nishi*, 9 Haw.App. 516, 524, 852 P.2d 476, 480 (1993), we concluded that error in admitting police opinion regarding the defendant's performance on field sobriety tests was harmless error and did not prejudice the defendant, because the trial court did not consider or rely on the officer's testimony in arriving at its decision:

> "I'm not really, frankly, looking at the officer's specific evaluation. I'm evaluating the picture that I get of what the defendant did that day.
>
> \* \* \* \* \* \*

> [Defendant's] balance was extremely poor from what I can see here. He had balance and coordination problems on every one of the [FSTs]."

*Id.* at 524, 852 P.2d at 480. It is true that the court in this case did not specify what evidence it relied upon in rendering its ruling. But, as previously discussed, neither Mitchell nor the record rebuts the presumption that the court ignored all incompetent evidence.

In *Vliet, supra*, error in admitting a police officer's testimony was held harmless because there was overwhelming evidence to support the conviction. The trial court in that case found a quantum of incriminating evidence quite similar to that in this case:

> Vliet ..., without stopping at the stop sign, made a right turn. [The police officer] observed that the smell of alcohol emanated from Vliet's breath and that Vliet's eyes were red and glassy. Vliet had difficulty producing his ID, initially showing [the officer] a picture of Christ.... Vliet was unable to locate his ID until [the police officer] pointed it out to him. Upon exiting his vehicle, Vliet left the door open, blocking traffic. Vliet also "took slow deliberate steps like[ ] ... he was really concentrating in [sic] walking." Finally, Vliet had balance and coordination problems during every phase of the FST, even failing, at times, to follow [the police officer's] instructions.

*Vliet*, 91 Hawai'i at 293, 983 P.2d at 194.

Our conclusion that the court's evidentiary error was harmless beyond a reasonable doubt is based, in part, upon the conclusion that there was a wealth of overwhelming and compelling evidence of impairment. Given the applicable standard of review, *a fortiori* we can conclude that there was sufficient evidence to convict Mitchell of DUI. *See, e.g., State v. Hopkins*, 60 Haw. 540, 542, 592 P.2d 810, 812 (1979) (*"viewing the evidence in the light most favorable to the State,* there is substantial evidence to support the conclusion of the trier of fact" (emphasis added)).

Here again, we acknowledge Mitchell's defense of identity. In order to contradict the

testimony of the police officers, Mitchell testified that his acquaintance Crawford, and not he, was driving his white sedan at the time of the accident. Mitchell testified that Crawford drove that day because Mitchell had taken medication for his back and heel and was therefore in no condition to drive. According to Mitchell, Crawford inexplicably fled the scene immediately after the accident, and has not been found since. Mitchell further testified that he told the police officer who arrived on the scene that he was not driving the car.

The short answer to Mitchell's identity defense, in the context of our review for sufficiency of the evidence, is Officer Kaupalolo's testimony that Mitchell admitted he was the driver of his white sedan at the time of the accident. Taken in the light most favorable to the prosecution, this one bit of evidence suffices on the issue of identity.

Moreover, on appeal we "will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence." *Vliet*, 91 Hawai'i at 293, 983 P.2d at 194 (citation omitted). Although the court did not directly address the issue of credibility, its ruling implies that it did not find Mitchell's identity defense credible. Again, it "is for the factfinder [sic] to assess the credibility of witnesses and to resolve all questions of fact; the [finder of fact] may accept or reject any witness's testimony in whole or in part." *State v. Birdsall*, 88 Hawai'i 1, 8–9, 960 P.2d 729, 736–37 (1998).

We conclude, therefore, that there was sufficient evidence to convict Mitchell of DUI.

*C. There Was Sufficient Evidence to Convict Mitchell of Inattention to Driving.*

Finally, Mitchell argues that the mere fact that a collision occurred between his vehicle and the vehicle in front of it was not sufficient evidence to find him guilty of inattention to driving. We discern, however, much more than that mere fact in the record.

The relevant statute provides that

[w]hoever operates any vehicle without due care or in a manner as to cause a collision with, or injury or damage to, as the case may be, any person, vehicle or other property shall be fined not more than $500 or imprisoned not more than six months, or both.

HRS § 291–12 (1993). This statute requires a showing of negligence in the operation of the defendant's vehicle; i.e., the failure to exercise that care which a reasonably prudent person would have exercised under the given circumstances. *State v. Reyes*, 57 Haw. 533, 534–35, 560 P.2d 114, 115–16 (1977) (citing *State v. Tamanaha*, 46 Haw. 245, 377 P.2d 688 (1962)).

As previously discussed, sufficient evidence was adduced at trial to support a finding that Mitchell was the driver of his vehicle at the time of the accident. Officer Kaupalolo further testified that he determined who was responsible for the accident by "[t]he statements of both operators and vehicle placement and damage." Officer Kaupalolo opined that the vehicle with rear-end damage was stopped in traffic, and that Mitchell's car, which sustained front-end damage, plowed into the rear of that car.

Mitchell contends, and we agree, that mere occurrence of an accident, without more, is insufficient to sustain a conviction for inattention to driving. *See Tamanaha*, 46 Haw. at 257, 377 P.2d at 695. Admittedly, the record does not suffer from a plethora of evidence as to the physical circumstances of the accident. However, as detailed above, there is more in this record than the mere occurrence of an accident.

Moreover, the fact that a defendant was under the influence of alcohol is always germane to a charge of inattention to driving. *Id.* at 255, 377 P.2d at 694 (a police officer's testimony that the defendant was under the influence of alcohol is "always a proper consideration on a charge of 'careless and heedless' driving" (citations omitted)).[3]

The Hawai'i Supreme Court held in *Tamanaha* that although the evidence of the

---

**3.** In *State v. Tamanaha*, 46 Haw. 245, 377 P.2d 688 (1962), the Hawai'i Supreme Court affirmed the defendant's conviction for "careless and heedless" driving pursuant to R.L.H.1955, § 311-1, which prohibited the operation of "any vehicle ... carelessly or heedlessly of the rights or safety of others, or in manner so as to endan-

circumstances surrounding the accident was incomplete, the physical evidence, along with evidence of the defendant's intoxication, and the testimony of the defendant, the investigating officer and the owners of the other car, were sufficient to show the probability of negligence on the part of the defendant, which is all that is required to sustain his conviction: "We need not determine that the evidence shows negligence as a matter of law but merely that the evidence shows a possibility that negligence could be found as a matter of fact." *Id.* at 259, 377 P.2d at 696.

 In light of the whole record in this case, particularly Mitchell's apparently ex-

ger or be likely to endanger any person or prop-

treme inebriation, we conclude that the evidence, taken in the light most favorable to the prosecution, was sufficient to convict Mitchell of inattention to driving.

## V. Conclusion

Accordingly, we affirm the December 30, 1998 judgment of the district court.